[No. D059843. Fourth Dist., Div. One. July 24, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD McKEE, Defendant and Appellant.

**1330**

## Counsel

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**McDONALD, J.**—Richard McKee appeals an order entered by the trial court on remand after the California Supreme Court's decision in *People v. McKee* (2010) 47 Cal.4th 1172 [104 Cal.Rptr.3d 427, 223 P.3d 566] (*McKee*). Following an evidentiary hearing, the trial court confirmed McKee's indeterminate-term civil commitment as a sexually violent predator (SVP) under the Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.; Act or SVP Act),[1] as amended by Proposition 83, which was passed by the electorate in 2006. "Proposition 83 . . . modified the terms by which [SVP's] can be released from civil commitment under the [Act]. In essence, it changes the commitment from a two-year term, renewable only if the People prove to a jury beyond a reasonable doubt that the individual still meets the definition of an SVP, to an indefinite commitment from which the individual can be released if he [or she] proves by a preponderance of the evidence that he [or she] no longer is an SVP." (*McKee, supra*, 47 Cal.4th at pp. 1183–1184.) *McKee* affirmed in part and reversed in part McKee's civil commitment under the Act and directed us to remand the matter to the trial court for an evidentiary hearing to determine whether the People, applying constitutional equal protection principles, could demonstrate a constitutional justification for imposing on SVP's a greater burden to obtain release from commitment than on those persons committed under the Mentally Disordered Offenders Act (Pen. Code, § 2960 et seq.) (MDO's) and those persons committed after being found not guilty by reason of insanity (Pen. Code, § 1026.5, subd. (a)) (NGI's). (*McKee*, at pp. 1208–1209.)

█ Following a 21-day evidentiary hearing, the trial court concluded the People met their burden to justify the disparate treatment of SVP's under the standards set forth in *McKee*. On appeal, McKee contends the trial court erred by finding the People met that burden. We conclude the trial court correctly found the People presented substantial evidence to support a

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

reasonable perception by the electorate that SVP's present a substantially greater danger to society than do MDO's or NGI's, and therefore the disparate treatment of SVP's under the Act is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 8, 2004, a petition was filed to establish McKee as an SVP within the meaning of the Act. The petition alleged McKee was "a person who has been convicted of a sexually violent offense against two or more victims for which he was sentenced and who has a diagnosed mental disorder that makes him a danger to the health and safety of others, in that it is likely he will engage in sexually violent predatory criminal behavior." It alleged he had been convicted of two counts of committing lewd and lascivious acts on a child under the age of 14 (Pen. Code, § 288, subd. (a)). One victim was an 11-year-old girl and the other was an eight-year-old girl.[2] The petition requested that McKee be committed to the custody of the State Department of Mental Health (DMH) for a period of two years.

On March 5, 2007, an amended petition was filed restating the original petition's factual allegations and requesting that McKee be committed to the DMH's custody for an indeterminate term pursuant to the Act (as amended on Nov. 7, 2006, by the electorate's passage of Prop. 83). Following a five-day trial, the jury returned a verdict finding McKee was an SVP within the meaning of the Act and the trial court issued an order committing him to the custody of the DMH for an indeterminate term pursuant to the Act. (*McKee, supra*, 47 Cal.4th at pp. 1184–1185.) McKee filed a notice of appeal challenging that order. (*Id.* at p. 1185.) On appeal, we rejected McKee's claims that the indeterminate commitment under Proposition 83 violated federal or state due process, ex post facto or equal protection provisions; we also rejected his challenges to the sufficiency of the evidence and adequacy of the jury instructions. (47 Cal.4th at p. 1185.) The California Supreme Court granted review and limited the issues to whether the Act, as amended by Proposition 83, violated McKee's constitutional rights under the due process, equal protection, and ex post facto clauses. (47 Cal.4th at p. 1185.)

In *McKee*, the California Supreme Court rejected McKee's due process and ex post facto claims. (*McKee, supra*, 47 Cal.4th at pp. 1188–1195.) However, the court disagreed with our conclusion that SVP's were not similarly

---

[2] At trial, the evidence showed McKee had been convicted in 1991 for committing lewd acts against an 11-year-old babysitter and in 1998 for committing lewd acts against his eight-year-old niece. (*McKee, supra*, 47 Cal.4th at p. 1184, fn. 1.)

situated to MDO's and NGI's for purposes of the equal protection clause. (47 Cal.4th at pp. 1202–1203.) Because the court believed neither we nor the trial court understood the proper standard for considering equal protection claims, *McKee* remanded the matter for an evidentiary hearing for the trial court to determine whether, applying the strict scrutiny standard, the People can justify the disparate treatment of SVP's under the Act by showing the disparate treatment of SVP's was necessary to further compelling state interests. (47 Cal.4th at pp. 1184, 1197–1198, 1208–1209.) *McKee* stated that on remand the People "will have an opportunity to justify Proposition 83's indefinite commitment provisions, at least as applied to McKee, and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate." (*Id.* at p. 1210, fn. omitted.)

After the case was remanded to the trial court following *McKee*, the trial court conducted an evidentiary hearing to determine whether the People could justify the Act's disparate treatment of SVP's under the strict scrutiny standard for equal protection claims. At the hearing, the People presented the testimony of eight witnesses and documentary evidence. The trial court also allowed McKee to present evidence; he presented the testimony of 11 witnesses and documentary evidence. The court issued a 35-page statement of decision summarizing the extensive testimonial and documentary evidence presented at the hearing and finding the People had met their burden to establish, by a preponderance of the evidence, that the disparate treatment of SVP's under the Act was based on a reasonable perception of the greater and unique dangers they pose compared to MDO's and NGI's. Accordingly, the court confirmed its March 13, 2007, order committing McKee to the custody of the DMH for an indeterminate term under the Act. McKee timely filed a notice of appeal.

DISCUSSION

I

*The SVP Act and Proposition 83*

In *McKee*, the California Supreme Court summarized the SVP Act and Proposition 83's 2006 amendment of the Act (*McKee, supra*, 47 Cal.4th at pp. 1185–1188), which summary we quote in large part as follows:

"The Act, as originally enacted (Stats. 1995, ch. 763, § 3, p. 5922), provided for the involuntary civil commitment for a two-year term of confinement and treatment of persons who, by a unanimous jury verdict after trial (. . . former §§ 6603, subd. (d), 6604), are found beyond a reasonable

doubt to be an SVP (former § 6604). [Citations.] A person's commitment could not be extended beyond that two-year term unless a new petition was filed requesting a successive two-year commitment. [Citations.] On filing of a recommitment petition, a new jury trial would be conducted at which the People again had the burden to prove beyond a reasonable doubt that the person was currently an SVP. [Citations.] . . .

"As originally enacted, an SVP was defined as 'a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' (Former § 6600, subd. (a).) A 'sexually violent offense' included a Penal Code section 288 lewd act on a child under age 14. [Citations.] Under the Act, a person is 'likely' to engage in sexually violent criminal behavior (i.e., reoffend) if he or she 'presents a substantial danger, that is, a serious and well-founded risk, that he or she will commit such crimes if free in the community.' [Citation.] [¶] . . . [¶]

"On November 7, 2006, California voters passed Proposition 83, entitled 'The Sexual Predator Punishment and Control Act: Jessica's Law' amending the Act effective November 8, 2006. . . . Proposition 83 . . . changes an SVP commitment from a two-year term to an indefinite commitment. . . .

■ "Pursuant to Proposition 83, section 6604, which had prescribed a two-year term for SVP's, now provides in relevant part: 'If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an *indeterminate* term to the custody of the [DMH] for appropriate treatment and confinement . . . .' (Italics added.) Proposition 83 did not change section 6604's requirement that a person's initial commitment as an SVP be proved at trial beyond a reasonable doubt. Under Proposition 83, section 6605 continues to require current examinations of a committed SVP at least once every year. (§ 6605, subd. (a).) However, Proposition 83 added new provisions to section 6605 regarding the DMH's obligations: Pursuant to section 6605, subdivision (a), the DMH now files an annual report in conjunction with its examination of SVP's that 'shall include consideration of whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community.' ■ Subdivision (b) now provides that '[i]f the [DMH] determines that either: (1) the person's condition has so changed that the person no longer meets the definition of a sexually violent predator, or (2) conditional release to a less restrictive alternative is in the best interest of the

person and conditions can be imposed that adequately protect the community, the director shall authorize the person to petition the court for conditional release to a less restrictive alternative or for an unconditional discharge.' (§ 6605, subd. (b).) If the state opposes the director's petition, then, as under the pre-Proposition 83 statute, it must prove beyond a reasonable doubt that the person still meets the definition of an SVP.

"In the event the DMH does *not* authorize the committed person to file a petition for release pursuant to section 6605, the person nevertheless may file, as was the case with the pre-Proposition 83 Act, a petition for conditional release for one year and subsequent unconditional discharge pursuant to section 6608. (§ 6608, subd. (a).) Section 6608, subdivision (i), which was also unamended by the Act, provides: 'In any hearing authorized by this section, *the petitioner shall have the burden of proof by a preponderance of the evidence.*' (Italics added.) After a trial court denies a section 6608 petition, 'the person may not file a new application until one year has elapsed from the date of the denial.' (§ 6608, subd. (h).)

■ "In short, under Proposition 83, an individual SVP's commitment term is indeterminate, rather than for a two-year term as in the previous version of the Act. An SVP can only be released conditionally or unconditionally if the DMH authorizes a petition for release and the state does not oppose it or fails to prove beyond a reasonable doubt that the individual still meets the definition of an SVP, or if the individual, petitioning the court on his [or her] own, is able to bear the burden of proving by a preponderance of the evidence that he [or she] is no longer an SVP. In other words, the method of petitioning the court for release and proving fitness to be released, which under the former Act had been the way an SVP could cut short his [or her] two-year commitment, now becomes the only means of being released from an indefinite commitment when the DMH does not support release." (*McKee, supra,* 47 Cal.4th at pp. 1185–1188, fns. omitted.)

II

*Equal Protection Clause and* McKee

*Equal Protection Clause.*

■ "The right to equal protection of the laws is guaranteed by the Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution. The 'first prerequisite' to an equal protection claim is ' "a showing that 'the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' " . . .' [Citation.] [¶] 'Equal protection applies to ensure that persons similarly

situated with respect to the legitimate purpose of the law receive like treatment; equal protection does not require identical treatment. [Citation.]' [Citation.] The state 'may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified. [Citations.] Variation of the length and conditions of confinement, depending on degrees of danger reasonably perceived as to special classes of persons, is a valid exercise of power.' " (*People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1216–1217 [106 Cal.Rptr.2d 490].)

■ "Strict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment." (*People v. Green* (2000) 79 Cal.App.4th 921, 924 [94 Cal.Rptr.2d 355].) Applying the strict scrutiny standard, the state has the burden of establishing it has a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose. (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641 [88 Cal.Rptr.2d 283, 982 P.2d 154].) Alternatively stated, applying the strict scrutiny standard, a law "is upheld only if it is necessary to further a compelling state interest." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1156 [88 Cal.Rptr.2d 696].)

*McKee.*

■ On review before the California Supreme Court in this case, McKee contended "his involuntary commitment as an SVP under the Act, as amended by Proposition 83 in 2006, violated his federal constitutional right to equal protection under the law because it treats SVP's significantly less favorably than those similarly situated individuals civilly committed under other statutes." (*McKee, supra*, 47 Cal.4th at p. 1196.) *McKee* extensively discussed *In re Moye* (1978) 22 Cal.3d 457 [149 Cal.Rptr. 491, 584 P.2d 1097] (*Moye*), which the court considered to be "highly relevant to assessing McKee's [equal protection] claim." (*McKee*, at p. 1196.) *Moye* applied the strict scrutiny standard in reviewing the equal protection claim by an NGI who asserted that although NGI's are similarly situated to mentally disordered sex offenders (MDSO's), NGI's, unlike MDSO's, are retained in civil commitment in the custody of the DMH after the maximum term of their underlying offense without a further commitment proceeding in which the People bear the burden of proof. (*Moye*, at pp. 460–462.) *Moye* stated: "Because petitioner's personal liberty is at stake, the People concede that the applicable standard for measuring the validity of the statutory scheme now before us requires application of the strict scrutiny standard .of equal protection analysis. Accordingly, the state must establish both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest. [Citation.] At the very least, persons similarly situated must receive like treatment under the law." (*Moye, supra*, 22 Cal.3d at pp. 465–466.)

■ Addressing McKee's equal protection claim that MDO's are similarly situated to SVP's but are treated disparately, *McKee* stated: "SVP's under the amended Act are given indeterminate commitments and thereafter have the burden to prove they should be released (unless the DMH authorizes a petition for release). In contrast, an MDO is committed for a one-year period and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year. There is therefore no question that, after the initial commitment, an SVP is afforded different and less favorable procedural protections than an MDO." (*McKee, supra,* 47 Cal.4th at p. 1202.) ■ *McKee* concluded MDO's and SVP's are similarly situated for equal protection purposes. (*McKee,* at pp. 1202–1203.) Both MDO's and SVP's are found, beyond a reasonable doubt, to suffer from mental disorders that make them dangerous to others. (*Id.* at p. 1203.) Both have been convicted of a serious or violent felony and, at the end of their prison terms, have been civilly committed to the custody of the DMH for treatment of their disorders. (*Ibid.*) Also, " 'the purpose of the MDO Act and the [SVP Act] is the same: to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders.' " (*Ibid.*) Because MDO's and SVP's are similarly situated, "imposing on one group [(i.e., SVP's)] an indefinite commitment and the burden of proving they should not be committed, when the other group [(i.e., MDO's)] is subject to short-term commitment renewable only if the People prove periodically that continuing commitment is justified beyond a reasonable doubt, raises a substantial equal protection question that calls for some justification by the People." (*Ibid.*) *McKee* stated: "Because MDO's and SVP's have the same interest at stake—the loss of liberty through involuntary civil commitment—it must be the case that when society varies the standard and burden of proof for SVP's in the manner in which Proposition 83 did, it does so because of the belief that the risks involved with erroneously freeing SVP's from their commitment are significantly greater than the risks involved with freeing MDO's. [Citation.] A substantial question is raised about the basis for this belief." (*Id.* at p. 1204, fn. omitted.) However, *McKee* concluded: "[T]he reasons for differential treatment [of MDO's and SVP's] are not immediately obvious from the face of the two statutory schemes." (*Id.* at p. 1205.) In evaluating differential treatment of similarly situated classes "[w]hen a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body ' "has drawn reasonable inferences based on substantial evidence." ' (*Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 569 [63 Cal.Rptr.2d 467, 936 P.2d 473] . . . ; [citation].)" (*McKee,* at pp. 1206–1207.)

*McKee* also concluded that NGI's and SVP's are similarly situated and similar equal protection problems exist regarding those two commitment schemes. (*McKee, supra,* 47 Cal.4th at p. 1207.) The court further concluded "that, as with MDO's, the People have not yet carried their burden of justifying the differences between the SVP and NGI commitment statutes." (*Ibid.*)

*McKee* then addressed the burden the People bear in justifying the Act's disparate treatment of SVP's, stating: "We do not conclude that the People could not meet [their] burden of showing the differential treatment of SVP's is justified. We merely conclude that [they have] not yet done so. Because neither the People nor the courts below properly understood this burden, the People will have an opportunity to make the appropriate showing on remand. It must be shown that, notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society. This can be shown in a variety of ways. For example, it may be demonstrated that the *inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely.* Or it may be that *SVP's pose a greater risk to a particularly vulnerable class of victims, such as children.* Of course, this latter justification would not apply to SVP's who have no history of victimizing children. But in the present case, McKee's previous victims were children. Or the People may produce *some other justification.*" (*McKee, supra,* 47 Cal.4th at pp. 1207–1208, italics added, fn. omitted.) *McKee* directed the case be remanded "to the trial court to determine whether the People, applying the equal protection principles articulated in *Moye* and related cases discussed in the present opinion, can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*McKee,* at pp. 1208–1209, fn. omitted.)

██ *McKee* emphasized that "different classes of individuals civilly committed need not be treated identically." (*McKee, supra,* 47 Cal.4th at p. 1210.) The court noted that in *Conservatorship of Hofferber* (1980) 28 Cal.3d 161 [167 Cal.Rptr. 854, 616 P.2d 836], it "acknowledged the government's legitimate capacity to make reasonable distinctions: 'The state has compelling interests in public safety and in humane treatment of the mentally disturbed. [Citation.] It may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified. [Citations.] Variation of the length and conditions of confinement, depending on degrees of danger reasonably perceived as to special classes of persons, is a valid exercise of state power.' [Citation.] Moreover, we have recognized 'the importance of deferring to the legislative branch in an area which is analytically nuanced and dependent upon medical science.' [Citation.] But the government has not yet shown that the special treatment of

SVP's is validly based on the degree of danger reasonably perceived as to that group, nor whether it arises from any medical or scientific evidence. On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions, at least as applied to McKee, and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate." (*McKee*, at p. 1210, fn. omitted.)

 *McKee* gave the following guidance to the trial court on remand: "[M]ere disagreement among experts will not suffice to overturn the Proposition 83 amendments. The trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not whether they are incontrovertible or uncontroversial. The trial court is to determine not whether the statute is wise, but whether it is constitutional." (*McKee, supra,* 47 Cal.4th at pp. 1210–1211, fn. omitted.)

### III

### *Standard of Review*

McKee asserts, and we agree, that we review de novo the trial court's determination whether the Act, as amended by Proposition 83, violates his equal protection rights. We independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the Act. Although the trial court heard the testimony of many witnesses and received in evidence many exhibits, the instant constitutional question involved mixed questions of law and fact that are predominantly legal, if not purely legal questions, which are subject to de novo review. (*People v. Ault* (2004) 33 Cal.4th 1250, 1264 [17 Cal.Rptr.3d 302, 95 P.3d 523]; *People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243].) Furthermore, because in this case the trial court presumably did not decide any disputed historical facts, but determined only whether the People presented sufficient evidence to support a reasonable perception that SVP's pose a greater danger to society, we are in as good a position as the trial court to make that determination.[3] Therefore, we apply an independent standard in reviewing the trial court's order rejecting McKee's equal protection claim.

---

[3] Although the People argue we should defer to the trial court's findings of historical fact and, in particular, its determination of the credibility of expert witnesses, the trial court's statement of decision did not make any express findings regarding disputed historical facts or the credibility of certain witnesses. We believe we are in as good a position as the trial court to decide whether the evidence presented by the People during the remand hearing satisfied their burden to justify the disparate treatment of SVP's under the Act.

In independently reviewing the evidence admitted at the remand hearing, we must determine whether the People presented substantial evidence to support a reasonable inference or perception that the Act's disparate treatment of SVP's is necessary to further compelling state interests. (*McKee, supra,* 47 Cal.4th at pp. 1197–1198, 1206; *Moye, supra,* 22 Cal.3d at p. 465.) As quoted above, "[w]hen a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body ' "has drawn *reasonable inferences based on substantial evidence.*" ' " (*McKee,* at p. 1206, italics added.) For evidence to be "substantial," it cannot be just "any" evidence, but must be of ponderable legal significance, reasonable, credible, and of solid value. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632–1633 [29 Cal.Rptr.2d 191].) Furthermore, our power begins and ends with the determination whether there is substantial evidence, contradicted or uncontradicted, to support the legislative determination, and when two or more inferences can reasonably be deduced from the evidence, we are without power to substitute our deductions for those of the electorate or other legislative body. (Cf. *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925].)

IV

*The Evidence Presented by the People to Justify the Disparate Treatment of SVP's*

McKee contends the People did not meet their burden on remand to present evidence to justify the disparate treatment of SVP's under the Act. To justify that disparate treatment of SVP's, the California Supreme Court stated in *McKee* that the People on remand must show "that, notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society. This can be shown in a variety of ways. For example, it may be demonstrated that the *inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely.* Or it may be that *SVP's pose a greater risk to a particularly vulnerable class of victims, such as children.* Of course, this latter justification would not apply to SVP's who have no history of victimizing children. But in the present case, McKee's previous victims were children. Or the People may produce *some other justification.*" (*McKee, supra,* 47 Cal.4th at p. 1208, italics added, fn. omitted.) Following *McKee*'s guidance, the People presented evidence on each of those alternative grounds.

A

*Recidivism.*

The People presented evidence showing the inherent nature of the SVP's mental disorder makes recidivism significantly more likely for SVP's as a class than for MDO's and NGI's. (*McKee, supra,* 47 Cal.4th at p. 1208.) In a summary manner, we describe that evidence. The trial court took judicial notice of two studies conducted by the United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (DOJ). In a 1989 report, the DOJ reviewed the rates of recidivism of prisoners released in 11 states, including California, in 1983 for the three-year period following their release. As the trial court noted, that report concluded sex offenders generally reoffended at a higher rate than homicide offenders, but less often than property crime offenders. Released rapists were 10.5 times more likely to have a subsequent arrest for rape than nonrapists. Also, prisoners released for other sexual assaults were 7.5 times more likely to be arrested for a subsequent sexual assault than prisoners released for offenses other than sexual assault. In a 2003 report, the DOJ reviewed the rates of recidivism of sex offenders released from prisons in 15 states, including California, in 1994 for the three-year period following their release. That report concluded released sex offenders were four times more likely to be rearrested for a sex offense than nonsex offenders. Although as McKee notes, neither of those reports specifically reviewed the sexual reoffense rates of SVP's (as a subset of all sex offenders), we believe that one could reasonably infer from those reports, when considered with other testimony described below, that the sexual reoffense rates of SVP's, if released, would be equal to, if not greater than, the sexual reoffense rates of other sex offenders.

Dr. David Thornton, a psychologist, testified for the People. He is the treatment director for the Wisconsin SVP program at the Sandridge treatment center. Thornton testified that sex offenders have a higher rate of sexual recidivism (i.e., risk of sexual offending) than nonsex offenders. Referring to a 2009 report of the Massachusetts Department of Corrections regarding the recidivism rates of inmates released in 2002, Thornton testified that nonsex offenders had a 0.30 percent recidivism rate for a sex crime, while sex offenders had a 5.76 percent recidivism rate for a sex crime, making released sex offenders about 19 times more likely to commit a sex crime. Thornton was a codeveloper of the Static-99 test, a tool used to assess the risk that a sex offender will reoffend. He testified that given a group of sex offenders (e.g., SVP's) who have average Static-99 scores of between 5 and 6, he would expect them as a class to have a lifetime recidivism rate of between 50

to 60 percent for commission of new sex offenses. In Wisconsin, the great majority of SVP's have Static-99R scores of 6 and above.[4]

Dr. Rebecca Jackson, a psychologist, testified that she is the chief psychologist for South Carolina. Jackson discussed a 2007 study of 135 State of Washington sexual offenders who were referred for civil commitment under its SVP program, but for which no civil commitment petitions were filed by prosecutors. During the six-year period following their release from prison, 23 percent were reconvicted for new felony sex offenses. An additional 10 percent were reconvicted for felony nonsex offenses (although six of them had been arrested for a felony sex offense). In comparison, general sex offenders who were released (i.e., those not referred for the SVP program) had only a 2.7 percent recidivism rate for new felony sex offenses. The 2007 study concluded sex offenders referred for the SVP program (but for whom no commitment petitions were filed) had a much higher rate of sexual recidivism than general sex offenders who were released. Jackson testified that SVP's generally have Static-99 scores averaging between 5.4 (Wn.) and 6.17 (Wis.), whereas the average or mean Static-99 score for non-SVP sex offenders was only 3 (with a median score of only 2).

Dr. Robert Prentky, a psychologist and an expert on sexual violence, testified that studies have shown sex offenders generally have a reoffense rate of between 10 and 15 percent. However, he has never seen a study comparing recidivism rates of sex offenders with that of MDO's. Furthermore, although the DOJ's studies and other studies have not calculated the recidivism rates of SVP's versus other sex offenders, he believed the recidivism rates of sexual offenders who are civilly committed (e.g., SVP's) would be higher than the recidivism rates of sex offenders in general.

The People also presented DMH data (trial court exhibit 5) showing a significant difference between the Static-99 scores of SVP's and those of MDO's/NGI's. The average Static-99 score for all SVP's civilly committed since the passage of the amended Act in 2006 is 6.19. According to another exhibit (trial court exhibit 8), that score places SVP's in the "high" risk category for sexual reoffense. In comparison, the average Static-99 score for MDO's at Patton State Hospital subject to Penal Code section 290 registration requirements in 2010 was only 3.6, placing them in the "moderate-low" risk category for sexual reoffense. Also, the average Static-99 score for all patients discharged from Atascadero State Hospital since January 1, 2010, subject to Penal Code section 290 registration requirements (which group

---

[4] The Static-99R is a revised version of the Static-99 that takes into account the age of a sexual offender based on statistics showing the risk of sexual reoffense decreases as the offender ages.

includes MDO's and NGI's) is 4.6, placing them in the "moderate-high" risk category for sexual reoffense.

The electorate that passed Proposition 83 could reasonably infer from the above evidence that the sexual reoffense rates of SVP's, if released, would be equal to, if not greater than, the sexual reoffense rates of other sex offenders. However, as McKee argues, that evidence, by itself, does *not* support a reasonable inference that SVP's have higher sexual recidivism rates than do MDO's and NGI's. Therefore, the People's evidence on actual rates of sexual recidivism shows the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely than recidivism of sex offenders generally, but does not show SVP's have, in fact, a higher sexual recidivism rate than MDO's and NGI's. Nevertheless, that recidivism rate evidence, as the trial court concluded, "is significant, given that the goal of the SVP Act is specifically to protect society from particularly serious sexual offenses, and in light of the additional evidence presented that sexual crimes cause a different and more severe harm than most other crimes." Regardless of the shortcomings or inadequacy of the evidence on actual sexual recidivism rates, the Static-99 evidence discussed above supports, by itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's.

B

*Greater trauma of victims of sexual offenses.*

The People presented evidence that the victims of sex offenses suffer unique and, in general, greater trauma than victims of nonsex offenses. As the trial court noted, this factor is relevant to *McKee*'s factor of whether SVP's pose a greater risk to a particularly vulnerable class of victims than do MDO's and NGI's. (*McKee, supra,* 47 Cal.4th at p. 1208.)

Dr. Robert Geffner, a psychologist, testified regarding the effects of trauma on victims. Sexual trauma differs qualitatively from other traumas because of its intrusiveness and long-lasting effects. Sexual assault or abuse adversely affects victims psychologically, physiologically, socially, and neuropsychologically. Child abuse is the highest predictor of mortality in adults (although research does not always distinguish between physical or sexual abuse). Sexual assault victims generally feel guilty and have low self-esteem. They are more likely to be obese, abuse substances, commit suicide, and have sexuality issues. They acquire vulnerability that can be detected by sex offenders, making them more likely to be revictimized. Sexual abuse causes the greatest trauma of adverse childhood experiences.

Dr. Anthony Urquiza, a psychologist, testified regarding the thousands of abused children he has treated. Sexual abuse alters a child's normal development process and causes maladaptive development, especially when the child had an ongoing relationship with the perpetrator. Most sexual abuse of children is committed by persons the children know. Children who are sexually abused tend to have long-term and chronic adverse consequences (e.g., on their mental health and sexual behavior). They have nightmares, posttraumatic stress disorder (PTSD), intrusive imagery, and avoidance phenomena (i.e., disassociation). Sexually abused children disassociate, or do not maintain their current awareness, because they feel humiliated, embarrassed, ashamed, and fearful. This process of dysfunctional avoidance is more common with sexual abuse than with other types of abuse or violence. Victims of sexual abuse often have secondary responses, including substance abuse, eating disorders, self-mutilation, and suicidal ideation and attempts. Victims of childhood sexual abuse also suffer long-term mental health symptoms, including anxiety, depression, and oppositional defiant behavior or aggression. They also have sexual problems as adults, including problems with sexual intimacy, sexual promiscuity, prostitution, unwanted pregnancies, and acquiring sexually transmitted diseases. Also, it is generally believed that two-thirds of sexual abuse victims will be sexually revictimized as they get older. Sexually abused victims also have somatic problems, including headaches, stomach aches, and obesity. They also have difficulty with educational achievement. Dysfunction, disassociation and avoidance problems after sexual trauma are unique to sexual abuse and are not seen in victims of physical or other types of abuse.

Dr. Jon Conte, a social work professor, testified he had interviewed thousands of victims of sexual abuse. His testimony regarding the effects of sexual abuse was generally consistent with that of Drs. Geffner and Urquiza. Studies show sexual assault or abuse is a major cause of many mental health issues, including depression, PTSD, anxiety, phobias, cognitive distortions, disassociation, substance abuse, and intimacy problems. Also, victims of sexual abuse have a reduced quality of life.

Based on the testimony of Drs. Geffner, Urquiza, and Conte, we, like the trial court, conclude there is substantial evidence supporting the reasonable perception that the nature of the trauma caused by sex offenses is generally more intense or severe than the trauma caused by nonsex offenses and is sometimes unique to sex offenses. Alternatively stated, there is substantial evidence to support a reasonable perception by the electorate, as a legislative body, that the harm caused by child sexual abuse and adult sexual assault is, in general, a greater harm than the harm caused by other offenses and is

therefore deserving of more protection. Furthermore, that evidence and the evidence discussed above regarding recidivism rates support a reasonable inference that SVP's, as sexually violent offenders with serious mental disorders making them dangerous, generally pose an increased risk of harm to the vulnerable class of children. (*McKee, supra*, 47 Cal.4th at p. 1208.)

C

*Diagnostic and treatment differences.*

The People also presented evidence showing SVP's are significantly different from MDO's and NGI's diagnostically and in treatment. DMH statistics from 2005 through 2010 show that about 95 percent of MDO's and 90 percent of NGI's have major mental illnesses, such as schizophrenia, bipolar disorder, major depression, or another psychosis. Only 2 percent of MDO's and NGI's suffer from pedophilia or other paraphilias. In comparison, nearly 90 percent of SVP's are diagnosed with pedophilia or other paraphilias. In the years 2005 through 2010, less than 2 percent of SVP's were diagnosed with major mental illnesses. Although some expert witnesses criticized DMH's imprecise methods for assigning diagnoses for its patients, the testimony of other expert witnesses tends to support the significantly different diagnoses between SVP's and MDO's/NGI's.

Dr. David Fennell, a psychiatrist and chief of forensics at Atascadero State Hospital, testified that about 90 percent of MDO and NGI patients suffer from a psychotic mental disorder. In comparison, only 1 to 3 percent of SVP's suffer from a psychosis, but 66 percent of SVP's suffer from pedophilia and 33 percent have another paraphilia. Jackson also testified that a high percentage of SVP's have paraphilias. About 80 percent of SVP's in Wisconsin and 99 percent of SVP's in Washington are diagnosed with paraphilias. Dr. Robert Withrow, a psychiatrist and the acting medical director at Coalinga State Hospital, testified that 60 percent of SVP's are diagnosed with pedophilia and 40 percent are diagnosed with other paraphilias. About 15 percent of SVP's have schizophrenia, bipolar disorders, major depression, and anxiety disorders.

Fennell testified that the different diagnoses between SVP's and MDO's/NGI's led to, or were reflected in, their different treatment plans, different rates of treatment compliance and success, and different risks for sexual reoffense. He stated that MDO's, most of whom are housed at Atascadero, are overwhelmingly treated with psychotropic medications, resulting in their stabilization and amenability to psychosocial support

treatment. About two-thirds of MDO's and NGI's comply with their treatment programs, typically resulting in their decertification after about three years. Fennell testified that MDO's and NGI's with a sexual predicate offense were not more likely to commit a new sexual offense (versus another dangerous offense) on release because their mental disorders made them disorganized and unpredictable. In comparison, SVP's are more likely to commit a new sexual offense because of their diagnoses with pedophilia or other paraphilias.

Furthermore, the treatment plans for SVP's are different from those for MDO's and NGI's. SVP's treatment plans are not based on medications, but rather on giving them the tools to limit their risk of sexually reoffending. However, only about 25 percent of SVP's participate in treatment. The shortest time in which an SVP has completed treatment is two and one-half years. Many other SVP's took up to five years to complete treatment.

Fennell believes indeterminate civil commitments are more beneficial for SVP's because the former two-year commitments interfered with the treatment process when their treatment was put "on hold" pending the court hearing and oftentimes SVP's were absent from treatment for eight to nine months while their cases were pending.

Dr. Jill Stinson, a psychologist, is the sex offender treatment coordinator for a state hospital in Missouri. She testified regarding the different diagnoses and characteristics of patients who are severely mentally ill and those who are SVP's and/or have paraphilias. Severely mentally ill patients have very serious psychotic or mental disorders (e.g., schizophrenia, schizoaffective disorder, or bipolar disorder). Patients with paraphilia have fantasies, urges, or behaviors specific to something not normally considered sexual (i.e., deviant). For example, a patient may have had sexually deviant behaviors regarding children. Paraphilia could, but does not necessarily, rise to the level of an SVP-type mental illness. There usually are no outward signs that a person has paraphilia. Patients with paraphilia typically develop deviant sexual fantasies in early adolescence and probably begin their sexual offending during adolescence. Paraphilia typically remains stable or constant throughout a patient's lifetime. Although there may be an "aging out" effect where patients' behavior or acting out on their fantasies is decreased as they age, that does not mean their urges and fantasies are similarly decreased. Patients with paraphilia generally have a specific intent in selecting victims (e.g., boys age seven to 10 years) and carefully plan and execute their offenses (e.g., by "grooming" their victims before committing the offense). In contrast, patients with severe mental illnesses generally are not that organized and commit impulsive or opportunistic offenses. It is rare for a patient with a severe mental illness to sexually reoffend.

Stinson testified that the treatment plans for severely mentally ill patients and patients with paraphilia are different. Patients with severe mental illnesses generally are first treated with psychotropic medications and then with psychosocial support or intervention (e.g., therapy regarding communication skills, social skills, and problem solving). Their amenability to and compliance with treatment usually is very good. Most severely mentally ill patients are compliant with their medications and participate in treatment most of the time. In comparison, the treatment plans for patients with paraphilia generally involve psychosocial intervention-like treatment. Medications may decrease their sexual arousal, but not their deviant sexual interests. Treatment of paraphilia patients takes longer than for other patients because paraphilia is so pervasive, affecting their thoughts, beliefs, and interactions. Stinson estimated that effective treatment of SVP's with paraphilia generally requires more than 10 years. A higher percentage of SVP's (i.e., 10 to 15 percent) have antisocial or borderline personality disorders (i.e., involving pathological lying and instability, etc.) than do severely mentally ill patients, making their treatment more difficult. Also, unlike severely mentally ill patients, "not very many" SVP's are ready to work and participate in treatment. At Stinson's hospital, severely mentally ill patients generally stay for about five years, whereas sex offenders (e.g., SVP's and/or patients with paraphilia) stay about 10 to 15 years. She testified that a highly motivated SVP could complete treatment in five years, but that less than 10 percent of SVP's are so highly motivated.

Thornton testified that 80 to 90 percent of SVP's participate in Wisconsin's treatment program. Wisconsin has released about 160 SVP's (100 supervised discharges and 60 absolute discharges) after their indeterminate civil commitments. He believes that if SVP's do not see regular releases of other SVP's from continued civil commitment, they are far less likely to participate in treatment programs. Wisconsin's minimum period for treatment of SVP's is six years. He believes a two-year commitment causes distractions and a loss of motivation and interferes with treatment. He believes a highly motivated SVP could complete treatment in about six years.

Jackson testified that 77 to 88 percent of SVP's have personality disorders (e.g., antisocial personality disorders), making them more likely to act out their paraphilia. Also, very few SVP's (10 to 20 percent) have severe mental illnesses or psychotic disorders.

Regarding the advisability of indeterminate civil commitments for SVP's, the expert witnesses had differing opinions. As discussed above, Thornton and Fennell believed that two-year terms interfere with treatment of SVP's and Fennell further believed that indeterminate terms do not. In contrast, Dr. Jerry Kasdorf, the former chief psychologist at Coalinga State Hospital,

believes indeterminate civil commitments generally do not help SVP's in their treatment. Rather, he believes two-year commitments motivated more SVP's to participate in treatment and were not disruptive to their treatment. Kasdorf did not know of any SVP authorized by DMH to petition a court for release under the Act. Withrow believes an indefinite SVP commitment stifles hope and a determinate term gives an SVP a time goal in which to complete his or her treatment.

Based on the above evidence, there is substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses from those of MDO's and NGI's, and that their respective treatment plans, compliance, and success rates are likewise significantly different. That evidence and the evidence on recidivism discussed above, as the trial court found, "supports the conclusion that, as a class, SVP's are clinically distinct from MDO's and NGI's and that those distinctions make SVP's more difficult to treat and more likely to commit additional sexual offenses than are MDO's and NGI's." In particular, SVP's are less likely to participate in treatment, less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative. As the trial court found, "the large majority of SVP's simply are not motivated to enter treatment or to succeed in it if they do begin it." Furthermore, there is substantial evidence to support a reasonable inference that an indeterminate, rather than a determinate (e.g., two-year), term of civil commitment supports, rather than detracts from, the treatment plans for SVP's.

### D

In summary, we conclude the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended Act's disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released). (*McKee, supra*, 47 Cal.4th at p. 1207.) The People have shown that, "notwithstanding the similarities between SVP's and MDO's [and NGI's], the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*Id.* at p. 1208.) The People have shown "that the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely[;] . . . that SVP's pose a greater risk [and unique dangers] to a particularly vulnerable class of victims, such as children"; and that SVP's have diagnostic and treatment differences from MDO's and NGI's, thereby supporting a reasonable perception by the electorate that passed Proposition 83 that the disparate treatment of SVP's under the amended Act is necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered. (47 Cal.4th at p. 1208.)

To the extent McKee cites evidence, or reasonable inferences therefrom, supporting contrary conclusions or perceptions, or cites inconsistencies or other flaws in the evidence, he either misconstrues and/or misapplies the standard of review we apply in independently determining whether there is substantial evidence to support a reasonable perception that the disparate treatment of SVP's under the Act is necessary to further compelling state interests. As quoted above, "[w]hen a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body ' "has drawn *reasonable inferences based on substantial evidence.*" ' " (*McKee, supra,* 47 Cal.4th at p. 1206, italics added.) However, in independently reviewing the record for that substantial evidence, our power begins and ends with the determination whether there is substantial evidence, contradicted or uncontradicted, to support the legislative determination, and when two or more inferences can reasonably be deduced from the evidence, we are without power to substitute our deductions for those of the legislative body. (*Bowers v. Bernards, supra,* 150 Cal.App.3d at pp. 873–874.) As *McKee* stated, "mere disagreement among experts will not suffice to overturn the Proposition 83 amendments. The trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based— not whether they are incontrovertible or uncontroversial. The trial court is to determine not whether the statute is wise, but whether it is constitutional." (*McKee,* at pp. 1210–1211, fn. omitted.) We, like the trial court, conclude the disparate treatment of SVP's under the Act is reasonable and factually based and was adequately justified by the People at the evidentiary hearing on remand. Accordingly, we conclude the Act does not violate McKee's constitutional equal protection rights. In so doing, we do not consider or determine whether the Act is wise. (*McKee,* at pp. 1210–1211.)

V

*Least Restrictive Means Available*

Finally, we address McKee's assertion that the Act is unconstitutional unless it adopts the least restrictive means available to further the state's compelling interests. He argues: "The requirements of strict judicial scrutiny means that the disparate treatment of similarly situated groups may be upheld only if they are shown to be necessary for furtherance of a compelling state interest and they address that interest through the least restrictive means available. (*Bernal v. Fainter* [(1984)] 467 U.S. 216, 219–220 [81 L.Ed.2d 175, 104 S.Ct. 2312]; *Weber v. City Council* [(1973)] 9 Cal.3d 950, 958 [109 Cal.Rptr. 553, 513 P.2d 601].)" However, McKee does not carry his burden on appeal to persuade us the equal protection clause requires that disparate

treatment of similarly situated classes be not only necessary to further a compelling state interest, but also accomplished through the least restrictive means available.

The two cases McKee cites in support of his argument are unpersuasive. First, *Bernal* involved the suspect class of aliens. (*Bernal v. Fainter, supra,* 467 U.S. at p. 219, fn. 5.) In probable dictum and without citation to any supporting cases, *Bernal* noted: "In order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available."[5] (*Bernal v. Fainter, supra,* 467 U.S. at p. 219, fn. omitted.) Because *Bernal,* unlike this case, involved a suspect class and probable dictum, we believe it is both inapposite to this case and unpersuasive. (Cf. *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 33 [112 Cal.Rptr.2d 5] [citing *Bernal*'s requirement that the "least restrictive means available" be used in furthering a compelling state interest involving disparate treatment of a suspect class].) Second, our review of *Weber* does not reveal any discussion or application of a requirement that the least restrictive means available be used in disparately treating similarly situated classes. (*Weber v. City Council, supra,* 9 Cal.3d at p. 958.)

We are unaware of any case applying the "least restrictive means available" requirement to all cases involving disparate treatment of similarly situated classes. On the contrary, our review of equal protection case law shows the two-part test, as discussed in *Moye* and *McKee,* is the prevailing standard. *Moye* stated that in cases requiring the application of the strict scrutiny standard of equal protection analysis, "the state must establish both that it has *a 'compelling interest'* which justifies the challenged procedure *and* that the distinctions drawn by the procedure are *necessary to further that interest.*" (*Moye, supra,* 22 Cal.3d at p. 465, italics added.) Therefore, in strict scrutiny cases, the government must show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. (*Ibid.; In re Smith* (2008) 42 Cal.4th 1251, 1263 [73 Cal.Rptr.3d 469, 178 P.3d 446].) We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered.

---

[5] We believe that statement is dictum because *Bernal* ultimately concluded there was no factual showing by the State of Texas that the proffered purpose of the law in question "present[ed] a real, as opposed to a merely speculative, problem to the State. Without a factual underpinning, the State's asserted interest lacks the weight we have required of interests properly denominated as compelling." (*Bernal v. Fainter, supra,* 467 U.S. at pp. 227–228.)

## DISPOSITION

The order is affirmed.

Benke, Acting P. J., and Aaron, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 10, 2012, S204503.