Filed 3/1/13  P. v. Purcell CA6
Opinion on remand from Supreme Court
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H033795 |
| Plaintiff and Respondent, | (San Benito County Super. Ct. No. CU0127684) |
| v. | |
| LANCE DUANE PURCELL, | |
| Defendant and Appellant. | |

Lance Duane Purcell appeals from an order involuntarily committing him for an indeterminate term to the custody of the Department of Mental Health (Department) after a jury found him to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predator Act (SVPA).  (Welf. & Inst. Code, § 6600 et seq.)[1]  Appellant contends:  (1) the trial court erred in allowing evidence of prior SVP commitments to be the focus of the trial, which shifted the burden of proof to him to prove he was no longer an SVP; (2) the trial court lacked jurisdiction because the Department failed to evaluate appellant pursuant to a valid protocol; and (3) an indeterminate SVP commitment violates due process, equal protection, ex post facto and double jeopardy provisions of the state and federal Constitutions.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless stated otherwise.

In August 2010, we rejected most of appellant's challenges to the petition to extend his commitment under the SVPA (*People v. Purcell* (Aug. 30, 2010, H033795) [nonpub. opn.]).  However, we remanded the case for proceedings solely on the equal protection claim consistent with *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*).  In December 2010, the California Supreme Court granted appellant's petition for review and transferred the case back to our court with directions to vacate our decision and to suspend further proceedings pending finality of the proceedings on remand in *McKee I*, including any appeal and proceedings in the California Supreme Court.  As directed, we vacated our decision and suspended further proceedings.

After the trial court in *McKee I* conducted further proceedings on McKee's equal protection claim, it issued an order committing him as an SVP.  McKee appealed, and the Fourth Appellate District affirmed the commitment order.  (*People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*).)  Accordingly, we have lifted the suspension.

Having considered appellant's constitutional contentions in light of *McKee I* and *McKee II* as well as his other contentions, we affirm the order of commitment.


## I.  Statement of Facts

At trial, appellant stipulated that he had suffered qualifying convictions that are predicate offenses under the SVPA.  He raped 18-year-old Barbara and 14-year-old Caroline in 1976, and was sentenced to prison.  After his release, he attempted to rape two other women, Diane and Sally, and he was convicted of assault with a deadly weapon, false imprisonment and attempted rape in 1983.

Dr. Nancy Rueschenberg testified as a prosecution expert.  She interviewed appellant in May 2007 and reviewed his criminal and institutional records.  At that time, he was 60 years old.

Dr. Rueschenberg testified regarding appellant's developmental history. This history included: his mother was sexually abused by her father and she beat her three sons; appellant saw his older brother rape his younger brother; his mother institutionalized his older brother; his brother taught appellant to masturbate; and a minister attempted to fondle appellant. Appellant was married at age 22 to Nona. During that relationship, he exposed himself every two to three days. In 1971, he married Arlane and they lived together for five years. The marriage ended when he went to prison. During this marriage, he talked about fantasies regarding rape, illicit sex, and child molestation. He subsequently lived with another woman for two years. According to Dr. Rueschenberg, appellant's difficulty in a relationship was a precursor to his committing sexual offenses.

Dr. Rueschenberg also testified regarding appellant's nonqualifying offenses. At age 14, appellant was arrested for indecent exposure, but the case was closed at intake. In May 1962, at age 15, appellant was arrested for child molestation and placed in a boys ranch. In November 1963, he was arrested for child molestation and committed to the California Youth Authority. After being paroled for one week, he violated parole, including victimizing a three-year-old girl. In 1965, at age 18, appellant approached a nine-year-old girl, told her he was a police officer, and asked her to pull down her underwear or he would report her to the police department. Appellant then pulled down his own pants and began masturbating. Appellant was committed as a mentally disordered offender and sent to Atascadero State Hospital (Atascadero).

After his release from the hospital at the age of 22, appellant was arrested four times for indecent exposure. In 1976, he approached an 11-year-old girl and a 10-year-old girl and made them looked at a magazine depicting sexual acts. He was also charged with the attempted kidnappings of a nine-year-old girl and an 11-year-old girl, both of whom he attempted to force into his car at gunpoint. In addition, he approached a four-year-old girl and was charged with annoying and molesting a child based on his attempt

to get her into his car so they could play "nasty." The attempted kidnapping and molestation charges were dismissed as part of the plea agreement for the qualifying offenses.

In 1982, appellant was released from prison, and he attempted to rape Diane and Sally. After his release from prison in 1989, he violated his parole less than six months later when he approached a seven-year-old child and a nine-year-old child as they were walking home from school and showed them photos of naked men and women. He also approached a 14-year-old child and a 15-year-old child and showed them an obscene photo. Following his release for the parole violations, appellant was not in custody for two and one-half years. He then attempted to kidnap a five-year-old girl at gunpoint. Earlier that day, he had attempted to kidnap an eight-year-old girl. Appellant had also put masking tape over the license plate of his van and had a wig and glasses.

According to Dr. Rueschenberg, it was significant that appellant's sexual offenses began prior to age 15, he committed offenses as both a juvenile and an adult, he had four qualifying offenses, he had several other offenses that could have been qualifying offenses, and he had at least 22 victims. She also noted that he continued to commit sexual offenses despite repeated incarcerations.

Dr. Rueschenberg concluded that appellant had a diagnosable mental disorder that predisposed him to committing criminal sex acts. She diagnosed him with paraphilia not otherwise specified, pedophilia, exhibitionism, alcohol abuse, personality disorder with antisocial and narcissistic traits. The paraphilia diagnosis referred to "recurrent, intense sexually arousing thoughts, fantasies, urges or behaviors involving . . . the suffering or humiliation of one's self or one's partner, or children or other non-consenting persons." According to Dr. Rueschenberg, paraphilia and pedophilia are considered chronic, lifelong conditions. She also noted that "[t]here was some indication that it goes down with age. There's no specific age cut-off. It has more to do with whether the person is healthy or not, whether or not they have completed treatment, if they're cooperative with

supervision, if they have a stable romantic relationship, things like that." Based on these risk factors, Dr. Rueschenberg did not "adjust downward for [appellant's] age."

Dr. Rueschenberg evaluated appellant, using the Static-99, which is an actuarial tool that estimates an individual's risk for sexual reoffense. Appellant's score of 9 placed him at high risk to reoffend. His score was the highest of any patient that she had ever evaluated. A patient who scores 6 or above has a 27 percent chance of reoffense within five years, and a 33.5 percent of reoffense within 10 years. Dr. Rueschenberg conceded that the Static-99 is historical and not predictive. However, she considered other static and dynamic factors relating to appellant to confirm the risk assessment of the Static-99. Appellant also scored 15 on the MnSOST-R, which is considered very high risk.

Dr. Rueschenberg believed that appellant was likely to reoffend in a sexually violent predatory manner if released from custody. Though Dr. Rueschenberg acknowledged that appellant had not committed an offense in 15 years, she pointed out that the "fact that someone hasn't acted out in a strictly controlled environment is not proof that they no longer suffer from a paraphilic disorder." She also noted that appellant has reoffended every time that he has been released into the community and has failed to complete treatment.

Appellant told Dr. Rueschenberg that "he used to be the SVP poster boy," but that was no longer true. He also reported that his sex drive had diminished because he stopped masturbating. According to Dr. Rueschenberg, appellant was found not amenable to treatment while he was at Atascadero in 1960. After his crimes in 1976, appellant received no treatment in prison. However, appellant enrolled in the five-phase treatment program at Atascadero following his most recent commitment. He completed Phase I, entered Phase II, and was recommended to Phase III. However, appellant did not enter Phase III because he declined to participate in covert sensitization. Covert sensitization involves creating and writing detailed deviant sexual fantasies. Appellant told Dr. Rueschenberg that he had refused to participate in covert sensitization because he

was no longer having deviant sexual fantasies. His view was that if he was forced to have deviant sexual fantasies, it would be "going backwards."

Appellant testified that he admitted the SVP petition and was committed to Atascadero in 2002. He participated in Phase I of the treatment program and assumed responsibility for the harm he inflicted on others. In July 2000, he stopped his deviant fantasies and his obsessive preoccupation with sex. He stopped masturbating for six months to a year. When appellant was first incarcerated in the 1960's, he did not believe that he would be successful upon release. He believed that he would not reoffend upon his release in 1982, but he was wrong. Appellant explained that he was still having deviant sexual fantasies at that time. When he was released in 1989, he was not as certain that he would not reoffend as he had been in 1982. According to appellant, he had no "paraphilia to trigger at this point." He believed that he had completely changed over the last eight years and he will not reoffend if released.

Two expert witnesses testified for the defense. Dr. Jay Adams interviewed appellant and reviewed his records. She diagnosed him with paraphilia not otherwise specified and exhibitionism "by history," that is, his disorder was no longer active. She noted that there was no evidence in the last 15 years that appellant had exhibited anything relating to paraphilia or exhibitionism. She also testified that there was very little research that paraphilia is a life-long condition. The chance of reoffending after age 60 is "probably less than 5 percent."

Dr. Adams reviewed appellant's treatment history. She noted that he began treatment as soon as he could, which was unusual, and completed three years of treatment. In Dr. Adams's opinion, appellant's reasons for refusing to participate in covert sensitization were "very well-founded," because research has shown that its effectiveness is "minimal to none." She also testified that the staff at Coalinga State Hospital attempted to drop covert sensitization from the program, but were not authorized to do so. According to Dr. Adams, appellant understood his treatment, was committed to

treatment, and his understanding had helped him to deal with his issues. She also testified that there is no research to support a requirement that sex offenders must complete all five phases of the state hospital treatment program to ensure that they are capable of functioning in the community. Based on appellant's age and his participation in treatment, Dr. Adams found that he was not likely to reoffend if released from custody. Thus, she concluded that he did not meet the SVP criteria.

Dr. Charlene Steen also interviewed and evaluated appellant. In addition to reviewing his developmental and criminal history, Dr. Steen noted that she had worked with appellant in 1983 and remembered him as a "very troubled young man." According to Dr. Steen, appellant had "done a lot of work" on relapse prevention, that is, he identified his risk factors and learned how to "handle them more appropriately."

Dr. Steen administered a variety of psychological tests to appellant. He scored in the normal range on tests of his cognitive ability, had no anger issues, and scored very low on the Hare Psychopathy Checklist. His score on the Millon Clinical Multiaxial Inventory reinforced her conclusion that appellant did not have a personality disorder, and he "barely qualified" as a having a substance abuse disorder on the Substance Abuse Subtle Screening Inventory. Regarding substance abuse, Dr. Steen noted that appellant had not used alcohol or drugs since 1995 despite their availability.

Dr. Steen diagnosed appellant with mental disorders "by history" because they were "not active now." They are: paraphilia not otherwise specified for sex with nonconsenting adults; pedophilia; alcohol abuse; and exhibitionism. According to Dr. Steen, the Static-99 is not accurate for individuals over age 60. She also testified that the rate of reoffense is lower with age and treatment. The likelihood of reoffense after age 60 is "very, very small" or about 3 percent.

Dr. Steen concluded that appellant was not likely to reoffend based on his age, his completion of various programs, including Father Miskella's Thinking Skills for Offense Prevention, and Phases I and II treatment, participation in AA for three years, and family

support.  Dr. Steen acknowledged that appellant dropped out of Phase III treatment, but noted that he continued to participate in other treatment programs.  In her view, covert sensitization programs have not proven to be very effective.  She testified that appellant has developed strategies to not have deviant sexual fantasies and has not had these fantasies for eight years.  In her opinion, it would be "foolish" for him to participate in covert sensitization.

Dr. Jesus Padilla, a clinical psychologist and co-chair of the "SVP design team," conducted a study to assess the effectiveness of the SVP treatment program.  The study compared those released with treatment and those who had been released without treatment.  There were 93 individuals who had not received treatment.  In this group, there was a 6 percent recidivism rate for sex crimes, and of that 6 percent, there was a 4 percent recidivism rate for sexually violent crimes.  There were seven individuals who completed Phase IV in the hospital and Phase V in the community.  None of these individuals reoffended.

## II.  Discussion

### A.  Evidence of Prior SVP Commitments

Appellant contends that the trial court erred in allowing evidence of his prior SVP commitments to become the focus of the trial, thereby shifting the burden of proof to him to prove he was no longer an SVP.  Relying on *People v. Munoz* (2005) 129 Cal.App.4th 421 (*Munoz*), appellant argues that the jury "was repeatedly asked to compare [his] present mental status with earlier findings that he was an SVP," and "the complete focus of this case was proving that [he] had not changed."  Appellant also argues that he was deprived of his federal constitutional right to due process.

In *Munoz*, the appellant filed a pretrial motion to exclude evidence of his two prior SVP commitments, arguing that "a danger existed the jury would not address the core elements of his SVP status, e.g., whether he suffered from a mental disorder, and would

simply consider whether there had been any change in his mental status and level of dangerousness since his last commitment." (*Munoz*, *supra*, 129 Cal.App.4th at p. 426.) The trial court admitted the evidence, "but only for the purpose of showing such history." (*Ibid*.)

During the examination of the expert witness in *Munoz*, the prosecutor noted that the appellant was committed to the state hospital in 1998 and 2000. The expert witness agreed that her assignment was "'to evaluate essentially [appellant's] progress and to determine whether or not he continues to meet that criteria under the SVP law.'" (*Munoz*, *supra*, 129 Cal.App.4th at p. 427.) The appellant testified that he did not suffer from a mental disorder and that his prior sex offenses were the result of substance abuse. (*Ibid*.) On cross-examination, the prosecutor asked the appellant whether he held that belief in 1992 and why he did not contest the experts' findings in 1998. (*Ibid*.) When the appellant stated that he did not remember the case, he was shown the minute order in which he waived his right to trial and submitted the matter. The minute order, which was admitted into evidence, reflected that the trial court committed the appellant as an SVP. (*Munoz*, at pp. 427-428.) The prosecutor also questioned the appellant about the 2000 recommitment proceeding. (*Munoz*, at p. 428.)

During opening argument, the prosecutor in *Munoz* argued that the appellant was an SVP and that "there had been no change in him during his two years at the state hospital." (*Munoz*, *supra*, 129 Cal.App.4th at p. 428.) In closing argument, the prosecutor told the jury that it had previously petitioned for the appellant to be committed as an SVP and that the appellant did not contest the claim in 1998. (*Ibid.*)

*Munoz* reasoned that "[i]t is tempting in the SVP recommitment context to characterize the issue as whether anything has changed since the last determination such that the defendant is no longer an SVP. This, however, is a potentially prejudicial mischaracterization. [The prosecutor] is required in a recommitment proceeding to prove beyond a reasonable doubt that the defendant is an SVP, not that he is still an SVP. The

danger in this mischaracterization is that it may suggest to a jury that the defendant must prove he is no longer an SVP; in any case it certainly lessens [the prosecutor's] burden by improperly establishing a datum of mental disorder and dangerousness. As we have concluded, each recommitment requires [the prosecutor] independently to prove that the defendant has a currently diagnosed mental disorder making him or her a danger. The task is not simply to judge changes in the defendant's mental state. [¶] . . . [¶] While it is proper, when relevant, to take judicial notice of the prior finding, it is improper to take notice of the truth of that *finding*. [Citations.] Thus, if there is some *legal* consequence to the fact of a prior SVP finding, a trier of fact may take judicial notice of it. However, the factual truth of any prior determination that the defendant then had a mental disorder and was as a result dangerous are not the proper subject of judicial notice. [¶] The prior finding has no res judicata effect with regard to the issues of the defendant's mental condition or dangerousness since, as noted above, it dealt with a different issue, i.e., whether the defendant then had a *currently* diagnosed mental disorder rendering him dangerous. [Citations.]" (*Munoz, supra*, 129 Cal.App.4th at pp. 430- 431.) Based on the "manner in which the prosecutor questioned witnesses, the evidence the trial court admitted, and the manner in which [the prosecutor] argued the case suggested that the issue was whether anything had changed since appellant's prior SVP commitment," the court reversed the order. (*Munoz*, at p. 432.)

In claiming that *Munoz* compels reversal in the present case, appellant focuses on the prosecutor's arguments, Dr. Rueschenberg's testimony, and the prosecutor's questioning of him.

At the end of opening argument, the prosecutor stated: "And what is known in this case is that Mr. Purcell has been committing sex crimes since he was 14 years old. . . . You'll also hear that he committed those type of acts -- as the judge said, you're going to hear atrocious acts that he's committed. The only time he didn't is when he got locked up. He got locked up, he didn't commit any more acts, was released, committed

those acts again, got locked up, was released, committed those acts again, and was locked up." The prosecutor continued: "The other thing that Dr. Rueschenberg is going to explain for you is something you're probably feeling as a general premise, as something intuitive, which is the best indicator for future action is past action. And something we know in this case is that Mr. Purcell has repeatedly committed these types of crimes, then been repeatedly locked up, and repeatedly reoffended when he was released. We know that. No dispute with respect to that." After summarizing the various crimes that appellant committed between 1965 and 1989, the prosecutor stated: "And what we have is a man who has committed all those different acts after repeated convictions and releases. . . . The best predictor of future action is past action. And that's what we have in front of us. No dispute there. As I said, given all you can consider and you will consider and that you will hear from Dr. Rueschenberg, her opinion is that [appellant] is in fact likely to reoffend without continued treatment and supervision."

Appellant also points out that Dr. Rueschenberg referred to his past behavior. She testified that "the staff at Atascadero had noted that he tends to get very religious when he's in prison, and that when he's out in the community seems not to be able to adhere to those things." She also testified that appellant "wasn't out of prison very long before he committed offenses again." She testified that his primary diagnosis at Coalinga State Hospital was paraphilia, not otherwise specified, pedophilia, exhibitionism, and alcohol abuse. She further testified: "So when he was in prison in the '70s, he didn't expose himself. He didn't molest children. He didn't rape women. And he got out and did so. When he was in prison in the '80s, he didn't do any of those things, and when he got out, he did so. Now he's back in prison, was in prison in the '90s, and he hasn't been able to get out."

In questioning appellant, the prosecutor asked: "[W]hen you were first locked up back in the '60s, a very young man, and you were incarcerated, and you were about to be released, did you believe then that you wouldn't recommit [sexual offenses]?" The

prosecutor next asked: "And after you were arrested again, after you did those crimes to those young girls, and you were incarcerated, and you received some treatment . . . did you at the time of your release in that instance believe that you were good to go . . . ?" The prosecutor clarified that he was referring to appellant's release in 1968. The prosecutor then asked: "And after your convictions in 1976, when you were ultimately released -- [¶] . . . [¶] in 1982, did you believe that you were not going to reoffend?" Appellant replied that he believed that, but he was wrong. The prosecutor asked: "What's the difference between then and now?" The prosecutor also asked whether appellant believed that he would reoffend when he was released in 1989. Appellant responded that he "felt [he] would give it a good shot." The prosecutor then asked: "What was the difference between 1982 and 1989?" The prosecutor next asked whether appellant had expressed his reservations about his ability to not reoffend to anyone in 1989. Later, the prosecutor asked: "Can you point to anything tangible that should make anyone believe that you're likely to act differently than you have acted every other time you have had the opportunity to be out in society?"

In his closing argument, the prosecutor argued: "What I think it comes down to in this case is that Mr. Purcell is saying, 'Trust me. I'm better now. And my doctors trust me. So you should believe what they say and you should find that I'm not a sexually violent predator.' But I think all of you would agree with me there's no reason whatsoever to trust Lance Purcell." He also argued: "But the fact is that the best indicator that we have, especially with respect to Lance Purcell, is the fact that he has reoffended over and over and over and over and over. He committed these awful crimes. [¶] Early on he didn't really seek treatment, he was found unamenable to treatment, but later on he said, yeah, when he was ready to get out, he thought that this was it. He got locked up again, after not thinking he was going to reoffend. He was in prison for a very long time. Got out again thinking he was okay, he was going to meet up with his ex-wife and start to get in re-touch with his family, but when that fell through, he did it again. I

can't stress that enough. We have got a long track history." The prosecutor later argued that appellant "just wants the opportunity to show that he's a cured man. All those awful things that you saw, the man who did those awful things, that's not him anymore." The prosecutor's final statement was: "He hasn't changed. The only thing that's changed is he's been locked up longer than the last couple times. That's all. He hasn't had the chance to reoffend. Don't give him that opportunity."

In contrast to *Munoz,* here, the prosecutor's focus was not whether appellant had changed between his prior SVP commitments and the trial. None of the questions or comments by the prosecutor or Dr. Rueschenberg's testimony referred to the prior SVP commitment findings. Instead, the prosecutor and Dr. Rueschenberg referred to appellant's past criminal offenses and behavior. Through argument and the introduction of evidence of appellant's actions and beliefs when he committed the sexual offenses and his current actions and beliefs, the prosecutor sought to focus the jury's attention on an assessment of appellant's credibility as well as a determination as to whether he was currently an SVP. None of these arguments or the evidence suggested that the jury's task was "to compare [appellant's] present mental status with an earlier finding that he or she is an SVP." (*Munoz*, *supra*, 129 Cal.App.4th at p. 432.)

Appellant also refers to the prosecutor's questions regarding why he admitted the original SVP petition and a portion of the prosecutor's closing argument that referred to the findings by prior juries that he was an SVP.

When appellant testified, the prosecutor asked: "Now, in January of 2002, when you first came up for commitment, if you will, under the SVP law, you at that time waived and admitted the initial petition; is that correct?" After appellant explained why he admitted the original petition, the prosecutor impeached him with testimony from his subsequent recommitment trial regarding his reasons for admitting the first petition. Unlike in *Munoz,* this questioning was not designed to suggest that appellant's previous admissions to being an SVP tended to prove that he was still an SVP. Instead, the

prosecutor was eliciting evidence relevant to an assessment of appellant's credibility since his defense was that he had stopped having sexual fantasies, and thus was not likely to reoffend.

During closing argument, the prosecutor referred to various studies produced by the defense that indicated extremely low rates of reoffense by individuals over age 60. He stated: "But my point was those numbers they threw out are irrelevant. None of those cases talks about a sexually violent predator who was found to be a sexually violent predator. Why? Because if you find he's a sexually violent predator, he's not getting out. The people in those studies, all of them, were released because they were found not be to sexually violent predators. [¶] Two other juries have found him to be a sexually violent predator. At least four other doctors, five other doctors, including this case, have found him to be a sexually violent predator. That's what he is." Taken in context, the prosecutor's reference to the prior juries' and doctors' SVP findings did not suggest to the jury that appellant was required to "prove that he is no longer an SVP." (*Munoz*, *supra*, 129 Cal.App.4th at p. 430.) Rather, the prosecutor was emphasizing that the studies were irrelevant because the participants in those studies were not SVP's while appellant had been found to be an SVP.

In sum, we disagree with appellant's claim that the prosecutor "based his entire case on the fact that appellant had been committed before, released before, and reoffended." Here, appellant's extensive history of sexual offenses was relevant to a determination of his current mental disorder. However, the admission of this evidence did not render the trial fundamentally unfair. Nor did it effectively shift the burden of proof to him to prove that he was no longer an SVP.

### B.  Motion to Dismiss

Appellant next contends that the trial court erred in denying his motion to dismiss the petition to recommit him as an SVP on the ground that his evaluation by mental

health professionals was conducted pursuant to an invalid protocol or "underground regulation."

Section 6601, subdivision (c) requires that the Department develop and update a "standardized assessment protocol" (protocol) by which to evaluate individuals who may be SVP's. The protocol must "require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." Only after two professional mental health evaluators agree that an individual meets the criteria for being an SVP based on the protocol does the Department file a petition for involuntary commitment under the SVPA. (§ 6601, subds. (c)-(f), (h).)

"The purpose of this evaluation is not to identify SVP's but, rather, to screen out those who are not SVP's. 'The Legislature has imposed procedural safeguards to prevent meritless petitions from reaching trial. "[T]he requirement for evaluations is not one affecting disposition of the merits; rather, it is a collateral procedural condition plainly designed to ensure that SVP proceedings are initiated only when there is a substantial factual basis for doing so." ' (*People v. Scott* (2002) 100 Cal.App.4th 1060, 1063.) The legal determination that a particular person is an SVP is made during the subsequent judicial proceedings, rather than during the screening process. (*Ibid.*)" (*People v. Medina* (2009) 171 Cal.App.4th 805, 814 (*Medina*).)

The Department published the Clinical Evaluator Handbook and Standardized Assessment Protocol (2007) for the purpose of conducting the SVP evaluations prescribed under section 6601. In August 2008, the Office of Administrative Law (OAL) concluded that certain provisions of this handbook met the definition of a regulation and that these provisions should have been adopted pursuant to the Administrative Procedures Act (APA) (Gov. Code, § 11340 et seq.). (2008 OAL Determination No. 19, p. 13.) A regulation that is adopted in violation of the APA is invalid and is called an

"'[u]nderground regulation.'" (Cal. Code Regs., tit. 1, § 250.) While an OAL determination is not binding on this court, it is entitled to deference. (*Grier v. Kizer* (1990) 219 Cal.App.3d 422, 431, disapproved on another ground in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 577 (*Tidewater*).)

Appellant claims that the Department's failure to evaluate him pursuant to a valid protocol deprived the trial court of fundamental jurisdiction.

In *In re Ronje* (2009) 179 Cal.App.4th 509 (*Ronje*), the petitioner brought a petition for writ of habeas corpus, arguing that the assessment protocol used to evaluate him as an SVP was invalid as an underground regulation. (*Ronje*, at p. 513.) In determining whether the protocol was subject to the APA, *Ronje* relied on the test articulated in *Tidewater*, *supra*, 14 Cal.4th 557. *Tidewater* stated: "'A regulation subject to the APA thus has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] Second, the rule must "implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure." [Citation.]'" (*Ronje*, at p. 516.) *Ronje* concluded that the protocol met both prongs of the *Tidewater* test. (*Ronje*, at p. 516.)

The People argue, however, that the challenged portions of the protocol do not meet the second portion of the first *Tidewater* prong. They assert that the "protocol left up to the evaluators' independent professional judgment whether or not an individual meets the SVP criteria. The protocol did not declare how all SVP evaluations, or 'class of cases' should be decided. Instead, it provided a guide for the independent evaluators to use in making their decisions." We need not address this argument because we agree with the People's position that, even assuming the protocol was invalid, the trial court was not deprived of fundamental jurisdiction and appellant has failed to demonstrate prejudice.

In *Ronje*, the reviewing court held that the use of an invalid assessment protocol did not deprive the trial court of fundamental jurisdiction. (*Ronje*, *supra*, 179 Cal.App.4th at p. 517.) Appellant argues that *Ronje* was wrongly decided. We disagree.

*Ronje* reasoned: "The term 'jurisdictional in the fundamental sense' means the 'legal power to hear and determine a cause.' ([*People v.*] *Pompa-Ortiz* [(1980)] 27 Cal.3d [519,] 529.) 'Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288 [*Abelleira*].)" (*Ronje*, *supra*, 179 Cal.App.4th at p. 518.) Lack of jurisdiction may also be applied more broadly to cases in which, "though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." (*Abelleira*, at p. 288.) "Issues relating to jurisdiction in its fundamental sense indeed may be raised at any time. [Citations.] By contrast, issues relating to jurisdiction in its less fundamental sense may be subject to bars including waiver . . . and forfeiture . . . ." (*People v. Mower* (2002) 28 Cal.4th 457, 474, fn. 6.)

*Medina*, *supra*, 171 Cal.App.4th 805 is instructive. In that case, the defendant argued that the Department had failed to evaluate him pursuant to a valid protocol, and thus the trial court lacked jurisdiction to proceed. (*Medina*, at p. 811.) The *Medina* court reasoned: "As to personal jurisdiction, there is no evidence to suggest, and Medina does not contend, that he lacked minimum contacts with the State of California [citations] or that he was not served with the documents necessary to initiate proceedings. [Citations.] As to subject matter jurisdiction, the superior court was undoubtedly the appropriate court to hear the commitment petition (Welf. & Inst. Code, §§ 6602, 6604), and there is no claim of untimeliness. (See *Litmon v. Superior Court* (2004) 123 Cal.App.4th 1156, 1171.)" (*Medina*, at p. 816.) Thus, the court concluded that the issue was whether "the

court acted in excess of its jurisdiction, rather than without fundamental jurisdiction." (*Ibid*.) The court then held that the defendant forfeited his challenge to the procedures that occurred before the petition was filed because he admitted the allegations in the petition. (*Medina*, at p. 817.)

In an analogous case, the court in *In re Wright* (2005) 128 Cal.App.4th 663 (*Wright*) reached the same conclusion regarding the trial court's jurisdiction. In *Wright*, the two initial evaluators did not agree on whether the defendant should be committed as an SVP. (*Wright*, at p. 667.) Pursuant to section 6601, subdivision (e), two "independent professionals" were then appointed, and the defendant was found to be an SVP following trial. (*Wright*, at pp. 667-669.) The defendant appealed, and the reviewing court rejected his sufficiency of the evidence challenge. (*Wright*, at p. 669.) The defendant then brought a petition for writ of habeas corpus. (*Ibid*.)

In *Wright*, the court assumed that one of the mental health professionals did not meet the criteria of section 6601, subdivision (g), which required that he have a doctoral degree in psychology. (*Wright*, *supra*, 128 Cal.App.4th at p. 672.) The court next discussed the effect of the error. (*Wright*, at pp. 672-675.) Noting that the SVPA does not require that the evaluations be alleged or appended to the petition, and the People are not required to prove their existence at either the probable cause hearing or at trial, the court stated the issue before it: "whether [the defendant] was deprived of due process . . . where one of two evaluations supporting a petition was defective, but a trial court found probable cause to proceed to trial on the petition and the individual was committed after receiving a trial on the merits." (*Wright*, at pp. 672-673.)

*Wright* concluded that the trial court was not without fundamental jurisdiction. "Illegalities in pretrial commitment proceedings that are not 'jurisdictional in the fundamental sense,' are not reversible error per se on an appeal from the subsequent trial. Rather, the 'defendant [must] show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination.' (*People v.*

*Pompa-Ortiz* (1980) 27 Cal.3d 519, 529.) . . . [¶] Irregularities in the preliminary hearing under the Act are not jurisdictional in the fundamental sense and are similarly subject to harmless error review. (*People v. Talhelm* [2000] 85 Cal.App.4th [400], 405.) Thus, reversal is not necessary unless the individual can show that he or she was denied a fair trial or had otherwise suffered prejudice. (*Ibid.*)" (*Wright*, *supra*, 128 Cal.App.4th at p. 673.)

For the reasons outlined in *Ronje*, *Medina* and *Wright*, any error in the present case was not jurisdictional in the fundamental sense.

We turn now to the issue of prejudice. As the *Medina* court noted, the purpose of the evaluations is "to screen out those who are not SVP's . . . [and] [t]he legal determination that a particular person is an SVP is made during the subsequent judicial proceedings." (*Medina*, *supra*, 171 Cal.App.4th at p. 814.) These proceedings include a probable cause hearing (§ 6602) and a trial (§§ 6603, 6604). At the probable cause hearing the People are required to show "the more essential fact that the alleged SVP is a person likely to engage in sexually violent predatory criminal behavior. [Citation.]" (*People v. Superior Court (Preciado)* (2001) 87 Cal.App.4th 1122, 1130.) After that determination is made, the matter proceeds to trial where the prosecution has the burden of proving beyond a reasonable doubt that the individual meets the criteria of the SVPA. (§§ 6603, 6604.)

In the present case, the trial court found that there was probable cause to believe that appellant met the criteria of the SVPA. Following trial, a jury found him to be an SVP. Appellant has not challenged the sufficiency of the evidence at either the probable cause hearing or trial. Instead, he argues that "[b]ecause the procedure itself was a flawed instrument, there is no way of knowing that the evaluations that were ultimately the basis of [his] case were valid." However, it is appellant's burden to show prejudice. (*Medina*, *supra*, 171 Cal.App.4th at p. 819.) He has not shown that dismissal of the petition on the ground that the protocol did not comply with the APA would have

resulted in an abandonment of the commitment proceedings. Nor has he shown that if he had been evaluated under a valid protocol, there was a reasonable probability that he would have been found not to be an SVP. Accordingly, appellant's challenge to the evaluations supporting the petition does not justify reversal of his commitment.

### C. Constitutional Challenges

#### 1. Statutory Background

When the SVPA was enacted, it provided for a two-year civil commitment for individuals who were found to be SVP's beyond a reasonable doubt after a trial. (*People v. Williams* (2003) 31 Cal.4th 757, 764.) The two-year commitment could then be extended after a trial in which the prosecutor carried the same burden of proof. (Former §§ 6604, 6604.1, 6605, subds. (d), (e).)

On November 7, 2006, the voters enacted Proposition 83. This initiative went into effect the following day, and it amended the SVPA to extend the commitment term from two years to indeterminate. (Ballot Pamp., Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 27, p. 137.)

Under the amended SVPA, when a court or jury determines beyond a reasonable doubt that a person is an SVP, "the person shall be committed for an indeterminate term to the custody of the State Department of State Hospitals for appropriate treatment and confinement . . . ." (§ 6604.) The committed person then "shall have a current examination of his or her mental condition made at least once every year. The annual report shall include consideration of whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community." (§ 6605, subd. (a).) The Department must file this report with the court and serve it on both parties. (*Ibid.*) The committed person may retain an expert to examine him or her or

have one appointed by the court if the person is indigent. (*Ibid.*) This expert shall have access to the committed person's records. (*Ibid.*)

When the Department determines that the committed person is no longer an SVP, it authorizes him or her to file a petition for conditional release or unconditional discharge. (§ 6605, subd. (b).) After the court receives a petition for conditional release or unconditional discharge, it must order a show cause hearing. (*Ibid.*) "If the court at the show cause hearing determines that probable cause exists to believe that the committed person's diagnosed mental disorder has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged, then the court shall set a hearing on the issue." (§ 6605, subd. (c).) Each party has the right to experts and a jury at this hearing, and the committed person is "entitled to the benefit of all constitutional protections that were afforded to him or her at the initial commitment proceeding." (§ 6605, subd. (d).) The state bears the burden of proving beyond a reasonable doubt "that the committed person's diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged." (*Ibid.*)

Even if the Department does not authorize a petition, a committed person may petition for conditional release or unconditional discharge under section 6608. In bringing this petition, the committed person is entitled to the assistance of counsel. (§ 6608, subd. (a).) The court may summarily deny this petition if it determines that the petition is frivolous. (*Ibid.*) When the court holds a hearing on the petition, the committed person has the burden of proof to show that he or she is no longer an SVP based on a preponderance of evidence. (§ 6608, subd. (i).) If the trial court finds that the committed person would not be "a danger to others due to his or her diagnosed medical disorder while under supervision and treatment in the community, the court shall order the committed person placed with an appropriate forensic conditional release program

. . . for one year." (§ 6608, subd. (d).)  After one year, the trial court shall hold a second hearing to determine if the committed person should be unconditionally released.  (*Ibid.*)  If the trial court denies the petition, the committed person must wait one year to file another petition.  (§ 6608, subd. (h).)  After a section 6608 petition has been denied, either as frivolous or after a hearing, the trial court shall deny any subsequent petitions under section 6608 "unless it contains facts upon which a court could find that the condition of the committed person had so changed that a hearing was warranted." (§ 6608, subd. (a).)

### 2.  Due Process, Ex Post Facto, and Double Jeopardy

In his opening brief, appellant argues that his indeterminate commitment under the SVPA, as amended in 2006, violated the due process, equal protection, ex post facto, and double jeopardy clauses of the state and federal Constitutions.  In his reply brief, appellant concedes that the California Supreme Court rejected similar due process and ex post facto claims.  (*McKee I*, *supra*, 47 Cal.4th at pp. 1193, 1195.)  We are bound by this holding.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[2]

### 3.  Equal Protection

Appellant contends that the SVPA violates the equal protection clause because it makes it more difficult for those committed under the SVPA to be released than those committed under the Mentally Disordered Offender Act (MDOA).  In a supplemental letter brief, appellant urges this court not to follow *McKee II*.

---

[2]  Appellant does not refer to his double jeopardy challenge in his reply brief.  We construe his silence as a concession that the claim has no merit under *McKee I*, *supra*, 47 Cal.4th 1172.  A civil commitment procedure does not constitute a second prosecution for purposes of the double jeopardy clause.  (*Kansas v. Hendricks* (1997) 521 U.S. 346, 369.)  Since *McKee I* held that the amended SVPA is not punitive in nature, appellant's double jeopardy contention has no merit.  (*McKee I*, at pp. 1194-1195.)

Both the federal and state Constitutions guarantee the right to equal protection of the laws.  (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.)  "'"The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment."'  [Citation.]  'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.'"  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)  *McKee I* concluded that SVP's are similarly situated to persons committed as mentally disordered offenders (MDO's) (Pen. Code, § 2960 et seq.) and individuals found not guilty by reason of insanity (NGI's) (Pen. Code, § 1026 et seq.).  (*McKee I*, *supra*, 47 Cal.4th at pp. 1203, 1207.)  *McKee I* also held that the claim of disparate treatment would be reviewed under the strict scrutiny standard.  (*McKee I*, at pp. 1197-1198.)  However, *McKee I* concluded that "[b]ecause neither the People nor the court below properly understood this burden, the People will have an opportunity to make the appropriate showing on remand.  It must be shown that, notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society."  (*McKee I*, at pp. 1207-1208.)  *McKee I* suggested ways in which the People might carry this burden, including presentation of evidence that due to the "inherent nature of the SVP's mental disorder" there is a greater risk of recidivism by SVP's or that the "SVP's pose a greater risk to a particularly vulnerable class of victims."  (*McKee I*, at p. 1208.)  Thus, *McKee I* directed the People on remand "to justify Proposition 83's indefinite commitment provisions . . . and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of the California's electorate."  (*McKee I*, at p. 1210.)

On remand, the trial court held a 21-day evidentiary hearing. (*McKee II*, *supra*, 207 Cal.App.4th at p. 1330.) Experts testified that SVP's pose a higher risk of recidivism, that victims of sexual offenses suffer greater trauma than victims of nonsex offenses, and that SVP's pose significant diagnostic and treatment differences from MDO's and NGI's. (*McKee II*, at pp. 1340-1347.) Based on this evidence, the trial court rejected McKee's equal protection claim. (*McKee II*, at p. 1330.)

Applying the de novo standard of review, the Court of Appeal reviewed the evidence and reached the following conclusion: "[T]he People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended Act's disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released). (*McKee [I]*, *supra*, 47 Cal. 4th at p. 1207.) The People have shown that, 'notwithstanding the similarities between SVP's and MDO's [and NGI's], the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society.' (*Id.* at p. 1208.) The People have shown 'that the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely[;] ... that SVP's pose a greater risk [and unique dangers] to a particularly vulnerable class of victims, such as children'; and that SVP's have diagnostic and treatment differences from MDO's and NGI's, thereby supporting a reasonable perception by the electorate that passed Proposition 83 that the disparate treatment of SVP's under the amended Act is necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered. [Citation.]" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.)

Appellant contends that *McKee II* did not properly conduct de novo review. He asserts that the Court of Appeal was "required to independently look at the evidence presented by both parties and determine if the findings made by the trial court were

correct," but it did not do this. He notes that though both parties presented documentary evidence, *McKee II* discussed only the prosecution's evidence without discussing its credibility or reliability. No such requirement is imposed on an appellate court. *McKee I* remanded the matter to allow the People to meet their burden that the SVPA's disparate treatment of SVP's furthered a compelling state interest. (*McKee I*, *supra*, 47 Cal.4th at pp. 1197-1198.) After independently reviewing the evidence, *McKee II* concluded "the disparate treatment of SVP's under the Act is reasonable and factually based and was adequately justified by the People at the evidentiary hearing on remand." (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1339-1348.) There was no error. We also note that the First District Court of Appeal rejected a similar challenge to *McKee II*, stating that the appellant's "claim that the appellate court failed to independently review the trial court's determination is frivolous." (*People v. McKnight* (2012) 212 Cal.App.4th 860, 864.)

Appellant next contends that *McKee II* misapplied the strict scrutiny test. He argues that "[i]t was not enough to simply show that the legislature or voters could reasonably believe that SVPs were more dangerous as a class. The prosecution had to show that SVPs actually were more dangerous as a class. The prosecution also had to show that the disparate treatment between SVPs, MDOs and NGIs was necessary to protect society." However, in remanding the case to the trial court, *McKee I* stated: "But the government has not yet shown that the special treatment of SVP's is validly based on the degree of danger *reasonably perceived* as to that group, nor whether it arises from any medical or scientific evidence. On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions, . . . and demonstrate that they are *based on a reasonable perception* of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate." (*McKee I*, *supra*, 47 Cal.4th at p. 1210, italics added.) Thus, in applying the strict scrutiny test, *McKee II* followed the language set forth in *McKee I*.

Appellant also contends that the evidence presented in *McKee II* did not support the ruling that SVP's were more dangerous than MDO's and NGI's, and thus harsher treatment was necessary. He claims that "*McKee II* acknowledged that the prosecution failed to show that SVPs had a higher sexual recidivism rate than MDOs or NGIs, but nevertheless concluded that the evidence 'supports, by itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's.' (*McKee II*, *supra*, at p. 1342, emphasis in original.)" *McKee II* relied on evidence that the scores on the Static-99 test, which assesses the risk that a sex offender will commit sex offenses, was higher for SVP's than for non-SVP sex offenders. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1340-1342.) As previously stated, *McKee II* followed *McKee I*.

Appellant next contends that *McKee II* reached its conclusion that victims of sexual abuse suffer greater trauma without any evidence regarding the trauma caused by non-sex offenses. We disagree. *McKee II* relied on evidence that "[s]exual trauma differs qualitatively from other traumas because of its intrusiveness and long-lasting effects," and that "[d]ysfunction, disassociation and avoidance problems after sexual trauma are unique to sexual abuse and are not seen in victims of physical or other types of abuse." (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1342-1343.)

Noting that there were three separate elements under attack in McKee's equal protection challenge, that is, the indeterminate commitment, the elimination of the right to a jury trial periodically, and the shifting of the burden of proof, appellant argues that '[t]he evidence in *McKee II* addressed only the issue of indeterminate commitments." This argument has no merit. Following independent review of the evidence, *McKee II* concluded that "the disparate treatment of SVP's under the Act is reasonable and factually based and was adequately justified by the People at the evidentiary hearing on remand." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1348.)

## III.  Disposition

The order is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Márquez, J.