Filed 9/24/13  P. v. Sanchez CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038849 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 210255) |
| v. | |
| MIKE SANCHEZ, | |
| Defendant and Appellant. | |

Following a court trial, the court found true beyond a reasonable doubt that defendant Mike Sanchez was a sexually violent predator (SVP) under the Sexually Violent Predator Act (SVPA).  (See Welf. & Inst. Code, § 6600 et seq.)[1]  By order filed September 25, 2012, the court ordered him committed for an indeterminate term to the custody of the State Department of State Hospitals (Department).

On appeal, Sanchez argues that he was not evaluated with a valid "standardized assessment protocol" as mandated by section 6601, subdivision (c) and that the SVPA's indeterminate commitment violates principles of equal protection.  We hold that neither of Sanchez's claims is meritorious, and we will therefore affirm the judgment.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

## BACKGROUND

This court summarized some of the procedural background of Sanchez's case in *Langhorne v. Superior Court* (2009) 179 Cal.App.4th 225, as follows: "Sanchez was convicted of one count of lewd act on a child in both 1979 and 1982. He was initially committed as a sexually violent predator in 2000. Thereafter, Sanchez was recommitted for additional two-year terms, with the most recent two-year commitment term extending to January 19, 2008. [Citation.] [¶] On June 8, 2007, before the expiration of the most recent two-year commitment period, the People filed a 'motion to retroactively apply an indeterminate term to respondent' under the 2006 amendments to the SVPA.[2] The trial court granted the motion on July 19, 2007, and ordered that Sanchez be committed to the custody of the State Department of Mental Health[3] for an indeterminate term. Sanchez appealed, and this court reversed the order imposing an indeterminate term of commitment in an opinion filed on July 10, 2008. [Citation.]" (*Id.* at pp. 230-231; see *People v. Sanchez* (July 10, 2008, H031856) [nonpub. opn.].)

On June 4, 2008, while Sanchez's appeal in case No. H031856 was pending, the People filed a petition to extend his commitment from the date his prior two-year term expired to "the term prescribed by law." The petition was supported by evaluations from

[2] The SVPA was amended twice in 2006. Prior to those amendments, an individual determined to be an SVP was committed to the custody of the Department for a two-year term, which could be extended for additional two-year periods. (Former § 6604, as amended by Stats. 2000, ch. 420, § 3; former § 6604.1, as amended by Stats. 2000, ch. 420, § 4.) Pursuant to Senate Bill 1128 and Proposition 83, the SVPA was amended to provide for an indeterminate term of commitment, and the references to two-year commitment terms and extended commitments in sections 6604 and 6604.1 were eliminated. (Stats. 2006, ch. 337, §§ 55, 56; see Cal. Const., art. II, § 10, subd. (a); §§ 6604, 6604.1.)

[3] In 2012, "State Department of State Hospitals" was substituted for "State Department of Mental Health" throughout the SVPA. (Stats. 2012, ch. 24, §§ 137-146.) We will use the term "Department" to refer to both the current and former Department.

Steven R. Jenkins, Ph.D. and C. Mark Patterson, Ph.D.; the evaluations had been performed in March and April of 2008.

A probable cause hearing was held on January 7, 2010 and January 21, 2010. At the hearing, the prosecution submitted updated evaluations from Drs. Patterson and Jenkins; these evaluations had been performed in May of 2009. Drs. Patterson and Jenkins both testified at the probable cause hearing. At the end of the hearing, the trial court found probable cause to believe Sanchez was an SVP.

In May 2010, Sanchez moved to dismiss the petition on the basis that the evaluators had not used a "standardized assessment protocol" as mandated by section 6601, subdivision (c).[4] The trial court denied the motion to dismiss on July 15, 2010.

A court trial began on September 14, 2012. Drs. Patterson and Jenkins both testified at trial.

Drs. Patterson and Jenkins both diagnosed Sanchez with pedophilia, schizophrenia, and antisocial personality disorder. They both believed that due to these disorders, Sanchez had difficulty controlling his behavior and that he was predisposed to commit sexually violent criminal acts.

Dr. Patterson reviewed Sanchez's history of sexually violent crimes, which began in 1965 when, at age 15, he sodomized or attempted to sodomize his six-year-old brother. In 1979, Sanchez admitted having molested at least 12 children. Following his conviction for digitally penetrating a six-year-old girl in 1978, Sanchez was sentenced to four years in prison. One year after his release from prison, he was rearrested for fondling and orally copulating a five-year-old boy, and he was sentenced to 11 years in prison. Following his release from prison for that offense, he violated parole by possessing cocaine and failing to register as a sex offender.

---

[4] Below, Sanchez's motion was heard collectively with similar motions filed by other SVP's facing recommitment, and Sanchez relied on declarations filed in one of those cases. We granted Sanchez's motion for judicial notice of the declarations.

Sanchez had acknowledged that he would seek out locations where children congregated and select potential victims. He had reported having sexual fantasies about children. Sanchez had only intermittently participated in sex offender treatment, and he could not answer when he was asked how he would keep himself from reoffending if released.

Drs. Patterson and Jenkins assessed Sanchez's risk of reoffense using a number of different instruments. On the Static 99-R, a "widely used" actuarial tool, Sanchez scored in the group with the highest risk of reoffense. On the Static 2002-R, he again scored in the high risk group. On the Sex Offender Risk Appraisal Guide (SORAG), Sanchez scored in the "relatively high risk range." On the Psychopathy Checklist (PCL-R), Sanchez scored with a "high degree of psychopathic personality traits." On the Structured Risk Assessment, Sanchez scored high in several categories.

Sanchez was age 62 at the time of trial, and he suffered from some medical problems. Dr. Patterson acknowledged that there is a drop in recidivism after age 61.

On September 25, 2012, the court found the petition true and ordered Sanchez committed to the custody of the Department for an indeterminate term. The order specified that it was "subject to the ultimate decision in" *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*) and *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*).

### DISCUSSION

#### A. *Brief Overview of the SVPA*

The SVPA provides for the involuntary civil commitment, for treatment and confinement, of an individual who is found by a unanimous jury verdict (§ 6603, subds. (e) & (f)), and beyond a reasonable doubt (§ 6604), to be a "sexually violent predator" (*ibid.*). The definition of an SVP is set forth in section 6600, subdivision (a)(1) as follows: " 'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental

disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

The SVP commitment process "begins when the secretary of the Department of Corrections and Rehabilitation (DCR) determines that a person in custody because of a determinate prison sentence or parole revocation *may* be a sexually violent predator. If such an initial determination is made, the secretary refers the inmate for an evaluation." (*In re Lucas* (2012) 53 Cal.4th 839, 845 (*Lucas*).) "After the secretary's referral, the inmate is screened by the DCR and the Board [of Parole Hearings (Board)] to determine whether the person is *likely* to be an SVP. If the DCR and the Board conclude that is the case, the inmate is referred for full evaluation by the [Department]. (§ 6601, subd. (b).)" (*Ibid.*)

"A full evaluation is done by two practicing psychiatrists or psychologists, or by one of each profession. (§ 6601, subd. (d).) If one evaluator concludes the inmate meets the SVP criteria, but the other evaluator disagrees, two more independent evaluators are appointed. (§ 6601, subd. (e).) A petition for commitment may not be requested unless the initial two evaluators appointed under subdivision (d), or the two independent evaluators appointed under subdivision (e), agree that the inmate meets the commitment criteria. (§ 6601, subds. (d), (f).)" (*Lucas, supra,* 53 Cal.4th at p. 845.) "If, after the full evaluation is completed, the [Department] concludes that the inmate is an SVP, the director of the [Department] requests that a petition for commitment be filed by the district attorney or the county counsel of the county where the inmate was convicted. If upon review that official concurs, a petition for commitment is filed in the superior court. (§ 6601, subds. (h), (i).)" (*Id.* at p. 846.)

With regard to the full evaluation prior to the filing of a petition, former section 6601, subdivision (c), as amended by section 26 of Proposition 83, provided: "The State Department of Mental Health shall evaluate the person in accordance with a standardized assessment protocol, developed and updated by the State Department of Mental Health,

to determine whether the person is a sexually violent predator as defined in this article. The standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder."

A commitment petition proceeds to trial only if the requisite findings are made at a probable cause hearing. (See § 6602, subd. (a); *Cooley v. Superior Court* (2002) 29 Cal.4th 228.) "[T]he only purpose of the probable cause hearing is to test the sufficiency of the evidence supporting the SVPA petition. [Citation.]" (*Id*. at p. 247.) ". . . If the judge determines that there is probable cause, the judge shall order that the person remain in custody in a secure facility until a trial is completed . . . ." (§ 6602, subd. (a).)

At trial, the court or jury must "determine whether, beyond a reasonable doubt, the person is a sexually violent predator." (§ 6604.) If the court or jury determines that the person is a sexually violent predator, the person is committed for an indeterminate term. (*Ibid*.; see fn. 2, *supra.*)

### B.    2009 Assessment Protocol

Sanchez contends the trial court erred by denying his motion to dismiss the petition, in which he argued that the evaluators did not use a "standardized assessment protocol" as mandated by section 6601, subdivision (c).

#### 1.    The 2009 Protocol

On February 11, 2009, the Department issued the "Standardized Assessment Protocol for Sexually Violent Predator Evaluations" (2009 Protocol). The 2009 Protocol had been adopted at the time of Sanchez's probable cause hearing in January 2010.

The 2009 Protocol is six pages long. The protocol states in its introduction: "This protocol cannot prescribe in detail how the clinician exercises his or her independent professional judgment in the course of performing SVP evaluations. Since the exercise

of independent, professional clinical judgment is required, this evaluation protocol is not, and cannot be, a detailed, precise step-by-step procedure like the kind of procedure that might apply to the chemical analysis of an unknown substance."

Part I of the 2009 Protocol contains statutory definitions of the terms "Sexually Violent Predator," "Sexually violent offense," "Diagnosed mental disorder," and "Predatory."

Part II of the 2009 Protocol is entitled "Referral Source," and it describes the Department's screening process.

Part III of the 2009 Protocol is entitled, "Evaluator Prerequisites," and it contains the requirements of section 6601, subdivision (d) [specifying that evaluations are to be performed by two practicing psychiatrists, two practicing psychologists, or one practicing psychiatrist and one practicing psychologist] and section 6601, subdivision (g) [specifying that if only one evaluator determines the person meets the SVP definition, a further examination must be conducted by two independent professionals meeting certain criteria].

Part IV-A of the 2009 Protocol specifies the information that evaluators must give to the potential SVP, as required by section 6601, subdivision (f). Part IV-B lists the risk factors that must be taken into account pursuant to section 6601, subdivision (c) – that is, criminal history, psychosexual history, type of sexual deviance, degree of sexual deviance, duration of sexual deviance, and severity of mental disorder. Part IV-C states the inquiry that must be answered by each evaluator: "Does the person being evaluated have a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody?"

Part IV-D of the 2009 Protocol (codified in section 4005 of the California Code of Regulations, title 9) provides: "The evaluator, according to his or her professional judgment, shall apply tests or instruments along with other static and dynamic risk factors when making the assessment. Such tests, instruments and risk factors must have gained

professional recognition or acceptance in the field of diagnosing, evaluating or treating sexual offenders and be appropriate to the particular patient and applied on a case-by-case basis. The term 'professional recognition or acceptance' as used in this Section means that the test, instrument or risk factor has undergone peer review by a conference, committee or journal of a professional organization in the fields of psychology or psychiatry, including, but not limited to, the American Psychological Association, the American Psychiatric Association, and the Association for the Treatment of Sexual Abusers."

Part IV-E of the 2009 Protocol specifies the process for updated evaluations as provided in section 6603, subdivision (c)(1). Part IV-F discusses several judicial opinions, including the United States Supreme Court's decision in *Kansas v. Crane* (2001) 534 U.S. 407 (*Crane*).

Part V of the 2009 Protocol explains what happens if the evaluation process results in agreement that the person is an SVP.

In Part VI, the 2009 Protocol recommends that evaluators be "knowledgeable and familiar with literature, studies, and tests or instruments used in the field of evaluation and diagnosis of sex offenders, as well as the latest developments in these areas." It also advises evaluators to, among other things, "obtain, review, and consider all relevant information and records that bear upon the case and be prepared to testify and undergo cross examination regarding these sources of information and how they contributed to the conclusions reached in the evaluation."

### 2. Proceedings Below

In his motion to dismiss the petition, Sanchez argued that the 2009 Protocol was not a "standardized assessment protocol" as required by section 6601, subdivision (c) because it "expressly eschews any specific procedures to be followed or any designated risk assessments or tests to be used." He asserted the 2009 Protocol improperly "leave[s] to the discretion of each evaluator which tests and instruments to use, and which static

and dynamic risk factors to consider."  Sanchez argued that the 2009 Protocol was invalid, that its use violated his right to due process, and that the appropriate remedy was dismissal of the petition.

Sanchez's motion to dismiss was supported by declarations from Robert L. Halon, Ph.D. and Richard Wollert, Ph.D.  Dr. Halon expressed his opinion that the 2009 Protocol "does not describe a 'standardized assessment protocol,' as that term is understood in the scientific and psychological community because adhering to the instructions contained therein cannot produce a reliable assessment, i.e., one which, using the same database, methods and procedures, always achieves *objective* results, whatever they might be, with each individual being assessed."  Dr. Wollert expressed a similar opinion in his declaration.

The prosecution submitted opposition to the motion to dismiss.  The prosecution noted that the term "standardized assessment protocol" (§ 6601, subd. (c)) is not defined in the statute.  The prosecution argued that by requiring a "standardized assessment protocol," the Legislature "wanted evaluations and assessments to follow the same general outline" but did not intend each evaluator to follow "an identical routine."  The prosecution further argued that "[b]ecause determination of SVP and mental disposition is a social science and not a hard science, the protocol must allow for professional judgment and discretion" and that a more detailed protocol would "likely create difficulties by improperly restricting the critical role professional judgment plays in any psychological forensic evaluation."

The prosecution further argued that even if the 2009 Protocol was invalid, the proper remedy was not dismissal of the petition.  Instead, the proper remedy would be to order new evaluations under a valid protocol.

In support of its opposition, the prosecution attached the transcript of a May 11, 2009 regulatory hearing held by the Department.  The topic of the hearing was the proposed adoption of section 4005 of the California Code of Regulations, title 9, which is

part of the 2009 Protocol and is quoted above. At the hearing, several speakers argued that the protocol should not be adopted because it did not give specific guidance to the evaluators and would not ensure a uniform evaluation system. In its opposition to Sanchez's motion, the prosecution argued that the hearing transcript showed that Sanchez's arguments had been considered but rejected.

The prosecution's opposition was further supported by a declaration from Amy Phenix, Ph.D. Dr. Phenix had been "tasked with developing the first Standardized Assessment Protocol," and she had provided the Department with updates to the protocol. She opined that the 2009 Protocol "comports with the generally accepted definition of a 'standardized assessment protocol.' " Her declaration described the training that SVP evaluators must go through, and she cited various papers and guidelines for the principle that SVP evaluators should use their professional judgment in selecting the tests or instruments for assessing a particular individual's risk of reoffense.

The trial court denied Sanchez's motion to dismiss, finding "that the 2009 protocol comports with the intention of the [L]egislature and comports with the accepted definition of the words, standardized assessment protocol. The 2009 protocol recognizes that individuals differ in psychological functioning, issues of mental health and level of risk for sexual reoffense. In short the protocol acknowledges psychological complexities of each human being. As Dr. Phenix says in her declaration, '. . . a rigid protocol would be to the detriment of good clinical judgment and accurate risk assessment.' " Because the trial court found the 2009 Protocol was valid, it also found Sanchez had not "suffered any due process violation."

### 3.     Analysis

As he did below, Sanchez argues that the 2009 Protocol is not a "standardized assessment protocol" as required by section 6601, subdivision (c). He contends that use of the invalid protocol was a violation of due process.

Citing to the Halon and Wollert declarations, Sanchez contends that the 2009 Protocol is not a "standardized assessment protocol" as required by 6001, subdivision (c) because it does not specify a detailed or uniform procedure for evaluators to follow when performing SVP evaluations. According to Sanchez, a "standardized assessment protocol" for performing SVP evaluations would list the types of records that are relevant, require each evaluator to collect and assess the same data, provide guidance on performing interviews, recommend particular actuarial instruments, and explain how to select comparison groups. Sanchez acknowledges that the 2009 Protocol does list specific risk factors that must be taken into account when determining a person's volitional control, but he claims the protocol is biased because all of the listed factors would only support a finding that a person has serious difficulty in controlling his or her behavior. Sanchez also asserts that Dr. Phenix's declaration does not support a finding that the 2009 Protocol is a valid "standardized assessment protocol" because she had a clear bias due to her work developing protocols for the Department.

The Attorney General notes that the phrase "standardized assessment protocol" is not defined in section 6601 and that nothing in that phrase "mandates a required level of detail." The Attorney General argues that the 2009 Protocol does require "basic uniformity" in evaluations, by telling evaluators the legal requirements for SVP evaluations, requiring them to use risk assessment instruments that are accepted in the field, recommending that evaluators be knowledgeable and familiar with developments in the field, and recommending that evaluators obtain and consider all relevant information. The Attorney General contends deference is due to the Department's determination that the need for evaluators to exercise independent professional judgment necessarily means that a detailed, step-by-step procedure cannot be prescribed.

We agree with the trial court that Sanchez has not established that the 2009 Protocol is invalid. Sanchez has cited, and we have found, no legislative history supporting his assertion that the Legislature intended the phrase "standardized assessment

protocol" to convey any specific degree of standardization. (§ 6601, subd. (c).) By specifying that the "standardized assessment protocol" be "developed and updated by the State Department of [State Hospitals]" (*ibid.*), the Legislature indicated that it was leaving the determination of detail and standardization to the Department. As the United States Supreme Court has recognized, "the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules," and "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science . . . ." (*Crane, supra,* 534 U.S. at p. 413.) And, as the California Supreme Court has recognized, the statutory scheme is designed to allow the evaluators to exercise their "*professional* judgment . . . within a specified *legal* framework." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 910.) In line with that intent, the 2009 Protocol ensures that the evaluators have a "legally accurate understanding of the statutory criteria," which "is crucial to the Act's proper operation." (*Ibid.*)

Even assuming that the 2009 Protocol is not valid as a "standardized assessment protocol" (§ 6601, subd. (c)), Sanchez must show that he was prejudiced in order to obtain relief. (See *Reilly v. Superior Court* (2013) 57 Cal.4th 641, 653 (*Reilly*).) In *Reilly*, the Supreme Court clarified that a defendant may obtain "relief arising from use of an invalid protocol in an SVP evaluation" only if he or she demonstrates that "the error was material." (*Id.* at p. 655.) That is, Sanchez can show prejudice only if there is " 'a reasonable probability, sufficient to undermine confidence in the outcome, that the error affected the evaluator's ultimate conclusion' " or that the error " 'reasonably might have affected the outcome' " of the proceedings. (See *id.* at p. 656.)

Here, the trial court found probable cause to believe Sanchez was an SVP, and it ultimately found him to be an SVP at trial, after hearing testimony about his sexually violent offenses, his diagnosed mental disorders, his participation in treatment, and his high scores on numerous risk assessment tools. Sanchez presented no evidence to

contradict the testimony of the two evaluators, and he "does not contend the evidence was insufficient to support [the trial court's] finding." (*People v. Landau* (2013) 214 Cal.App.4th 1, 17.) Under the circumstances, "[t]here is no indication in this record" that the initial evaluations, conducted pursuant to the 2009 Protocol, "affected [Sanchez's] trial." (See *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 530.) In short, Sanchez has failed to show that the use of the 2009 Protocol resulted in a material error (*Reilly, supra,* 57 Cal.4th at p. 655), and thus we conclude he is not entitled to any relief.

### C.      Equal Protection

Sanchez contends that the SVPA's indeterminate commitment scheme violates principles of equal protection. In his reply brief, he suggests that he is entitled to a remand so he can have his equal protection claim "adjudicated on the merits."

In *McKee I,* our Supreme Court addressed a claim that the indeterminate commitment scheme violated equal protection. The court determined that SVP's and mentally disordered offenders (MDO's; see Pen. Code, § 2960 et seq.) are similarly situated for equal protection purposes because they have been involuntarily committed with the objectives of treatment and protection of the public. (*McKee I, supra,* 47 Cal.4th at p. 1203.) The court also determined that SVP's have "different and less favorable procedural protections" than MDO's because "SVP's under the amended [SVPA] are given indeterminate commitments and thereafter have the burden to prove they should be released (unless the [Department] authorizes a petition for release). In contrast, an MDO is committed for a one-year period and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year." (*Id.* at p. 1202.) The court rejected the appellate court's finding that "the legislative findings recited in the [Proposition 83] ballot initiative" were sufficient to justify the disparate treatment of SVP's and MDO's. (*Id.* at p. 1207.)

The California Supreme Court found that SVP's and individuals found not guilty by reason of insanity (NGI's; see Pen. Code, § 1026 et seq.) are also similarly situated

and "a comparison of the two commitment regimes raises similar equal protection problems . . . ." (*McKee I, supra,* 47 Cal.4th at p. 1207.) Consequently, the court agreed with the Sanchez "that, as with MDO's, the People have not yet carried their burden of justifying the differences between the SVP and NGI commitment statutes." (*Ibid.*)

However, in *McKee I,* the California Supreme Court did "not conclude that the People could not meet its burden of showing the differential treatment of SVP's is justified." (*McKee I, supra,* 47 Cal.4th at p. 1207.) The court gave the People "an opportunity to make the appropriate showing on remand," noting that the People would have to show that "notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*Id.* at p. 1208.)

The *McKee I* court then remanded the case to the trial court with instructions "to determine whether the People . . . can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*McKee I, supra,* 47 Cal.4th at pp. 1208-1209, fn. omitted.)

On remand in *McKee I,* "the trial court conducted an evidentiary hearing to determine whether the People could justify the [SVPA's] disparate treatment of SVP's under the strict scrutiny standard for equal protection claims. At the hearing, the People presented the testimony of eight witnesses and documentary evidence. The trial court also allowed McKee to present evidence; he presented the testimony of 11 witnesses and documentary evidence. The court issued a 35-page statement of decision summarizing the extensive testimonial and documentary evidence presented at the hearing and finding the People had met their burden to establish, by a preponderance of the evidence, that the disparate treatment of SVP's under the [SVPA] was based on a reasonable perception of

the greater and unique dangers they pose compared to MDO's and NGI's." (*McKee II, supra,* 207 Cal.App.4th at p. 1332.)

McKee appealed, and Division One of the Fourth Appellate District affirmed the trial court's order. (*McKee II, supra,* 207 Cal.App.4th at pp. 1330-1331, 1350.) In *McKee II,* the appellate court explained that it would "independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the [SVPA]." (*Id.* at p. 1338.)

After performing its independent review of the evidence presented in the 21-day evidentiary hearing held in the trial court, the *McKee II* court made several findings. First, with respect to recidivism, the court determined that the expert witness testimony of three psychologists, as well several studies and the Static-99 data comparing recidivism rates, was sufficient to show that "the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely than recidivism of sex offenders generally, but does not show SVP's have, in fact, a higher sexual recidivism rate than MDO's and NGI's. . . . Regardless of the shortcomings or inadequacy of the evidence on actual sexual recidivism rates, the Static-99 evidence . . . supports, by itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's." (*McKee II, supra,* 207 Cal.App.4th at p. 1342.)

Second, the *McKee II* court considered whether the People had "presented evidence that the victims of sex offenses suffer unique and, in general, greater trauma than victims of nonsex offenses." (*McKee II, supra,* 207 Cal.App.4th at p. 1342.) Based on the expert witness testimony, the court concluded that "there is substantial evidence to support a reasonable perception by the electorate, as a legislative body, that the harm caused by child sexual abuse and adult sexual assault is, in general, a greater harm than the harm caused by other offenses and is therefore deserving of more protection." (*Id.* at pp. 1343-1344.)

Third, the *McKee II* court found that there was "substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses from those of MDO's and NGI's, and that their respective treatment plans, compliance, and success rates are likewise significantly different. That evidence and the evidence on recidivism . . . , as the trial court found, 'supports the conclusion that, as a class, SVP's are clinically distinct from MDO's and NGI's and that those distinctions make SVP's more difficult to treat and more likely to commit additional sexual offenses than are MDO's and NGI's.' In particular, SVP's are less likely to participate in treatment, less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative. . . . Furthermore, there is substantial evidence to support a reasonable inference that an indeterminate, rather than a determinate (e.g., two-year), term of civil commitment supports, rather than detracts from, the treatment plans for SVP's." (*McKee II, supra,* 207 Cal.App.4th at p. 1347.)

The appellate court therefore concluded in *McKee II* that "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended [SVPA's] disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released). [Citation.]" (*McKee II, supra,* 207 Cal.App.4th at p. 1347.) The California Supreme Court denied review of *McKee II* on October 10, 2012, and therefore the proceedings on remand in *McKee I* are now final.

Sanchez contends that "[t]he *McKee II* opinion contains three significant flaws": it failed to properly conduct a de novo review; it failed to properly apply the strict scrutiny test; and the facts it relied upon did not justify a disparate treatment of SVP's.

First, we disagree with Sanchez's claim that the *McKee II* court applied a deferential standard of review rather than an independent standard of review. Sanchez acknowledges that the appellate court stated that it was conducting a de novo review (*McKee II, supra,* 207 Cal.App.4th at p. 1338), but he points out that the appellate court

also stated that it was determining " 'whether the People presented substantial evidence to support a reasonable inference or perception that the Act's disparate treatment of SVP's is necessary to further compelling state interests.' [Citations.]" (*Id.* at p. 1338.) Having reviewed the opinion, we believe the *McKee II* court's description of its review is consistent with an independent, de novo review of the evidence, as well as with the Supreme Court's opinion and directions in *McKee I.* We also note that the First District Court of Appeal rejected a similar challenge to *McKee II,* stating that the "claim that the appellate court failed to independently review the trial court's determination is frivolous." (*People v. McKnight* (2012) 212 Cal.App.4th 860, 864.)

Second, we reject Sanchez's claim that the *McKee II* court in effect applied a rational basis test rather than a strict scrutiny test in reviewing the evidence presented at the hearing. He claims that the court failed to properly analyze whether the distinctions between the SVPA and other involuntary commitment schemes were "necessary" to protect society, and he criticizes *McKee II* for analyzing only whether there was "a reasonable inference or perception" that SVP's are more dangerous than MDO's or NGI's, rather than whether SVP's are "actually" more dangerous than those groups. (*McKee II, supra,* 207 Cal.App.4th at p. 1342.)

We disagree that *McKee II* failed to apply strict scrutiny. The *McKee II* court referred to the issue as "whether the People presented substantial evidence to support a reasonable inference or perception that the Act's disparate treatment of SVP's is *necessary* to further compelling state interests. [Citations.]" (*McKee II, supra,* 207 Cal.App.4th at p. 1339, italics added.) Moreover, the appellate court's use of the phrase "reasonable inference or perception" (*ibid.*) reflects the California Supreme Court's remand instructions: in *McKee I,* the court stated, "On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions . . . and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's

electorate." (*McKee I, supra,* 47 Cal.4th at p. 1210, fn. omitted.) Thus, in applying the strict scrutiny test, *McKee II* followed the language set forth in *McKee I.*

Third, we do not agree with Sanchez's claim that the evidence at the *McKee II* trial did not support the appellate court's ruling. Sanchez makes several different contentions in this regard.

For example, Sanchez claims that the *McKee II* court erroneously concluded that "[t]he People presented evidence showing the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely for SVP's than for MDO's and NGI's." (*McKee II, supra,* 207 Cal.App.4th at p. 1340.) He contends the appellate court did not examine any evidence comparing the sexual recidivism rate of SVP's with the sexual recidivism rate of MDO's and NGI's. However, *McKee II* did rely in part on evidence that the scores on the Static 99 test, which assesses the risk that a sex offender will commit new sex offenses, was higher for SVP's than for non-SVP sex offenders. (*McKee II, supra,* at pp. 1340-1342.) Moreover, the *McKee II* court acknowledged that the evidence presented only showed that "the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely than recidivism of sex offenders generally, but does not show SVP's have, in fact, a higher sexual recidivism rate than MDO's and NGI's." (*Id.* at p. 1342.) The court found that the recidivism rate evidence was nevertheless " 'significant, given that the goal of the SVPA is specifically to protect society from particularly serious sexual offenses,' " and that in any event, the Static 99 evidence did support "a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's." (*Ibid.*) In so concluding, *McKee II* thus followed *McKee I,* where the California Supreme Court in *McKee I* suggested that evidence concerning a greater *risk* of recidivism by SVP's was one type of evidence that the People might present to show that "notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to

society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*McKee I, supra,* 47 Cal.4th at p. 1208.)

Sanchez also claims that *McKee II* reached its conclusion that victims of sexual abuse suffer greater trauma without any evidence regarding the trauma caused by non-sex offenses. We disagree. The evidence relied on by the *McKee II* court included testimony that "[s]exual trauma differs qualitatively from other traumas because of its intrusiveness and long-lasting effects," and that "[d]ysfunction, disassociation and avoidance problems after sexual trauma are unique to sexual abuse and are not seen in victims of physical or other types of abuse." (*McKee II, supra,* 207 Cal.App.4th at pp. 1342, 1343.)

Sanchez further claims that the evidence concerning differences in diagnoses, treatment, compliance, and success rates between SVP's and MDO's or NGI's did not support the conclusion in *McKee II* that harsher treatment of SVP's was necessary. We are not persuaded by this argument. To the extent conflicting evidence was introduced at the trial, the People's burden was to show that "the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not [that] they are incontrovertible or uncontroversial." (*McKee I, supra,* 47 Cal.4th at pp. 1210-1211; accord, *McKee II, supra,* 207 Cal.App.4th at p. 1348.)

Lastly, Sanchez asserts that "there were three separate but related elements that were under attack in McKee's equal protection challenge," that is, the indeterminate term of commitment, the elimination of the right to a periodic jury trial, and the shifting of the burden of proof. Sanchez argues that the evidence presented in *McKee II* did not address the latter two issues. This argument is without merit. Following independent review of the evidence, *McKee II* concluded that "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the [SVPA's] disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released)," and that "the disparate treatment of SVP's under the Act is reasonable and factually based and was

adequately justified by the People at the evidentiary hearing on remand." (*McKee II, supra,* 207 Cal.App.4th at pp. 1347, 1348.)

In light of the Supreme Court's clearly expressed intent to avoid an unnecessary multiplicity of proceedings, the Supreme Court's denial of review in *McKee II,* and our conclusions regarding the asserted flaws in *McKee II,* we find that Sanchez's equal protection claims are without merit and do not require a remand for a further evidentiary hearing.

## DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
MÁRQUEZ, J.